**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

DARRIUS R. COPELIN                                      CIVIL ACTION

VERSUS                                                  NO. 18-10970

DARREL VANNOY, WARDEN                                   SECTION: "R"(5)

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.   Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.   *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Darrius Copelin, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.   On October 25, 2012, Copelin was charged by bill of information with one count of armed robbery with a firearm and one count of possession of a firearm by a convicted felon.   The same bill of information charged his girlfriend, Aisha Howard, as an accessory after the fact to the armed robbery.   In July 2014, Copelin went to trial before a jury and represented himself.   Because the jury ultimately was unable to render a verdict in the case, Judge Karen Herman discharged the jury, resulting in a mistrial.   The State subsequently entered a *nolle prosequi* and dismissed all charges in

Case No. 513-845.[1]

On October 22, 2014, the State reinstituted the same charges against Copelin in Case No. 522-255.[2]     Once again, Aisha Howard was charged in the same bill of information as an accessory after the fact to armed robbery.     The trial court denied Copelin's motion to quash on grounds of double jeopardy.[3]     His writ to the Louisiana Fourth Circuit challenging that ruling was denied.[4]     The defendants were severed for trial.     On September 1, 2015, Copelin's second jury trial commenced before Judge Herman with Copelin again representing himself, and he was found guilty on both counts.[5]     On October 9, 2015, his motion for new trial was denied and he was sentenced to imprisonment of 20 years for possession of a firearm by a convicted felon and 99 years for armed robbery.     The sentences were ordered to run concurrently without the benefit of probation, parole or suspension of sentence.[6]     The State filed a multiple bill of information as to the armed robbery count.[7]     After adjudicating him as a second-felony offender, the original sentence was vacated and he was resentenced on the armed robbery count to 125 years'

---

[1]  See Statement of the Case set forth by the Louisiana Fourth Circuit Court of Appeal. *State v. Copelin*, 2016-0264 (La. App. 4 Cir. 12/7/16), 206 So.3d 990.

[2]  State Rec., Vol. 1 of 6, Bill of Information, Orleans Parish.

[3]  State Rec., Vol. 1 of 6, Minute Entry, 11/17/14; *see also* State Rec., Vol. 2 of 6, Nov. 17, 2014 Judgment (exhibit to Louisiana Fourth Circuit Writ No. 2015-0043).

[4]  State Rec., Vol. 2 of 6, *State v. Copelin*, 2015-K-0043 (La. App. 4 Cir. Jan. 16, 2015).

[5]  State Rec., Vol. 1 of 6, Trial Minute Entries, 9/1/15 and 9/2/15.

[6]  State Rec., Vol. 1 of 6, Sentencing Minute Entry, 10/9/15.

[7]  State Rec., Vol. 1 of 6, Multiple Bill of Information.

imprisonment, to be served without benefit of probation, parole or suspension of sentence.[8]

On direct appeal, his appointed counsel raised two assignments of error:    (1) the second trial and conviction violated double jeopardy because the mistrial declared at the end of his first trial was manifestly unnecessary and undertaken without his consent and (2) the trial court erred in allowing the State to introduce impermissible "other crimes" evidence.[9] On December 7, 2016, the Louisiana Fourth Circuit Court of Appeal affirmed his convictions and sentences.[10]    On September 29, 2017, the Louisiana Supreme Court denied his application for writ of certiorari.[11]

On or about November 3, 2017, Copelin submitted an application for post-conviction relief to the state district court.[12]    In that application, he raised the following claims for relief:    (1) he was denied the ability to confront and cross-examine state witness, Officer Kevin Wheeler, about his dismissal from the police department because the State suppressed material impeachment evidence, (2) the trial court erred in denying the motion to suppress and allowing evidence gained from an illegal inventory search, and (3) he was deprived of

---

[8]  State Rec., Vol. 1 of 6, Minute Entry, 10/9/15.

[9]  State Rec., Vol. 4 of 6, Louisiana Fourth Circuit No. 2016-KA-0264, Appellant Brief.

[10]  *State v. Copelin*, 2016-KA-0264 (La. App. 4 Cir. 12/7/16), 206 So.3d 990; State Rec., Vol. 4 of 6.    Upon review, the court of appeal found one error patent.    Because his sentence for possession of a firearm by a convicted felon was illegally lenient, the court of appeal remanded for imposition of a mandatory fine under Louisiana Revised Statute 14:95.1.    On December 13, 2016, the trial court imposed the $1,000 fine. State Rec., Vol. 1 of 6, Minute Entry, 12/13/16.

[11]  *State v. Copelin*, 2017-K-0047 (La. 2017), 227 So.3d 286; State Rec., Vol. 6 of 6.

[12]  State Rec., Vol. 2 of 6, Uniform Application for Post-Conviction Relief.

the assistance of hybrid counsel.    On January 9, 2018, the state district court denied relief on the merits.[13]    On May 14, 2018, the Louisiana Fourth Circuit Court of Appeal denied his supervisory writ application.[14]

During the time that his related supervisory writ application was pending with the Louisiana Supreme Court, on or about November 6, 2018, he filed the instant federal application for habeas corpus relief.[15]    In that application, he asserted four grounds for relief:    (1) he was subjected to double jeopardy, (2) the trial court erred in allowing inadmissible "other crimes" evidence, (3) the trial court improperly restricted his ability to confront and cross-examine state witness, Officer Kevin Wheeler, about his termination from the department because the State suppressed material impeachment evidence; and (4) the trial court improperly denied his motion to suppress and admitted evidence gained from an illegal inventory search.    The federal district court granted Copelin's unopposed motion to stay the proceedings so that he could exhaust the claims pending before the Louisiana Supreme Court.    On November 12, 2019, the Louisiana Supreme Court denied his application for supervisory writ of review.[16]    On December 30, 2019, Copelin's motion to

---

[13]   State Rec., Vol. 1 of 6, Post-Conviction Relief Judgment, 1/9/18.

[14]   State Rec., Vol. 5 of 6, *State v. Copelin*, 2018-K-0299 (La. App. 4 Cir. 5/14/18).

[15]   Rec. Doc. 1, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus; *see also* Rec. Doc. 11, Supplemental Memorandum in Support.

[16]   *State v. Copelin*, 2018-KH-1008 (La. 11/12/19), 282 So.3d 221; State Rec., Vol. 6 of 6.

reopen the proceedings was granted.[17]

The State filed a response on August 28, 2020.[18]    The State does not contend that the federal application is untimely or that the claims were not exhausted; rather, the State argues that the claims should be denied on the merits.[19]

## Facts

On direct appeal, the Louisiana Fourth Circuit briefly summarized the facts adduced at trial:

> This case arises out of an armed robbery that occurred on September 9, 2012, at around 1:30 a.m., at the Homedale Inn, a neighborhood bar located near City Park in New Orleans, Louisiana. According to witnesses, a man wearing gloves and a ski mask and brandishing a gun walked into the bar. The man threw a back pack across the bar and demanded that the bartender "fill it up." The bartender complied with the demand, placing about $1,000 in the backpack. The man then backed out of the bar and fled on foot into the surrounding neighborhood. During the course of the robbery, the bar owner managed to hit the silent alarm located on the side of the cash register, which calls the police. As a result, the New Orleans Police Department ("NOPD") arrived within minutes after the robber fled.
>
> The NOPD linked Mr. Copelin to the crime through a vehicle registered to his girlfriend's grandmother that was found parked near the bar. The vehicle was parked away from the curb, impeding traffic, in the area that the robber fled. Mr. Copelin's wallet and cell phone were found in the vehicle. When the officers ran Mr. Copelin's name, they discovered that he had a prior offense— a 2003 federal armed robbery conviction—and that he was released from federal prison nineteen days before the robbery of the bar.[20]

---

[17]  Rec. Doc. 12.

[18]  The Court liberally allowed the respondent multiple extensions of time due to extenuating circumstances brought about by the global Covid-19 pandemic.

[19]  Rec. Doc. 25.

[20]  *State v. Copelin*, 206 So.3d at 994 (footnote omitted).

### General Standards of Review

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.     A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."     28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").     With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."     *Bell v. Cone*, 535 U.S. 685, 694 (2002).     A state-court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States

6

Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010). An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 572 U.S. 415, 426 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Id.* (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

## Analysis

### A. Double Jeopardy

Copelin asserts that his second trial on the same charges violated double jeopardy

principles, because the trial court abused its discretion at the first trial by not making a proper finding of "manifest necessity" before abruptly discharging the jury during deliberations and effectively declaring a mistrial.    The Louisiana Fourth Circuit Court of Appeal rejected the double jeopardy argument initially on supervisory review when Copelin challenged the trial court's interlocutory ruling denying his motion to quash the new bill of information, and again, on direct appeal, when Copelin assigned the issue as grounds for error.    On direct appeal, the court found that the assigned error was not properly preserved for review under state law (Louisiana Code of Criminal Procedure articles 775.1 and 841), because Copelin failed to object contemporaneously when the trial court granted a mistrial.[21]

As set out on direct appeal, the relevant event occurred during jury deliberations at Copelin's first trial, prompting the trial court to discharge the jury, and Copelin subsequently to raise the double jeopardy issue.    During deliberations, the following exchange occurred:

> At the end of Mr. Copelin's first trial, which lasted two days, jury deliberations commenced at 6:43 p.m. At 11:21 p.m. the trial court summoned the jury to [sic] courtroom and initiated the following colloquy:
>
>> THE COURT: Ladies and gentleman of the jury, y'all have been deliberating for almost going on five hours. Do you believe any further deliberations would assist you in rendering a verdict?
>>
>> FOREPERSON: For tonight?
>>
>> THE COURT: Yes.
>>
>> FOREPERSON: Yes.
>>
>> JUROR: I think so.

---

[21]    *See State v. Copelin*, 206 So.3d at 998-1000.

THE COURT: You do? All right. Go ahead.

The transcript reflects that the jury left the courtroom at 11:22 p.m. and returned seven minutes later—at 11:29 p.m. When the jury returned, the following colloquy transpired:

THE COURT: All right. Let the record reflect that all jurors are present. I have received a note from the jury that reads as follows. "We will be unable to come to a final decision tonight. We apologize."

Who is the foreperson?

FOREPERSON: I am.

THE COURT: All right. And do you feel that any further deliberations would assist you to render a verdict?

FOREPERSON: No.

THE COURT: No? All right. So I would like to thank you for your service. You are discharged. This case will be tried again on another day with another jury.

At this juncture, Mr. Copelin neither objected nor sought judicial relief. As noted earlier in this opinion, Mr. Copelin first sought judicial relief after the prosecution was re-instituted by filing a *pro se* motion to quash the bill of information. In that motion, he argued that he was being placed in jeopardy twice because the State reinstituted the charges after the jury was unable to return a verdict on July 9, 2014, in Case No. 513–845 "I". In arguing that jeopardy attached, he compared the prior mistrial to a non-responsive verdict. Denying the motion to quash, the district court reasoned that "because the defendant was not acquitted in his earlier trial, double jeopardy is not implicated." This court denied Mr. Copelin's subsequent writ application, stating:

We find no error in the district court's 17 November 2014 judgment, denying the relator's motion to quash wherein he alleges double jeopardy. A retrial following a mistrial because of a hung jury does not constitute double jeopardy. *State v. Nall*, 439 So.2d 420 (La. 1983). *State v. Copelin*, 14–0043 (La. App. 4 Cir 1/16/15) (unpub.).[22]

---

[22] *State v. Copelin*, 206 So.3d at 995; *see also* State Rec., Vol. 4 of 6, Trial Transcript

In denying his claim, the Louisiana Fourth Circuit considered both the double jeopardy assertions made by Copelin and the State's opposing argument that Copelin was not entitled to relief because he failed to preserve the issue critical to his double jeopardy claim. The appellate court reasoned as follows:

> Both the United States and the Louisiana Constitution afford double jeopardy protection; the Fifth Amendment to the United States Constitution and Article I, § 15 of the Louisiana Constitution prohibit the government from twice placing a person in jeopardy for the same offense. Double jeopardy protection is codified in La. C.Cr.P. Art. 591, which provides that "[n]o person shall be twice put in jeopardy of life or liberty for the same offense, except, ... where there has been a mistrial legally ordered under the provisions of Article 775."

> In *State v. Encalarde*, 579 So.2d 990, 991 (La. App. 4th Cir. 1990), which Mr. Copelin cites as dispositive, this court addressed the issue of whether the trial court erred by granting a mistrial under La. C.Cr.P. art. 775 (2)—"the jury is unable to agree upon a verdict." Summarizing the applicable statutory and jurisprudential principles, this court stated the following:

>> "It is universally held that a dismissal because of inability of the jury to reach a verdict is no bar to a subsequent prosecution," [Official Revision Comment "C" to Article 775,] citing two U.S. Supreme Court decisions. Thus, although the manifest necessity test employed by the federal courts and the categorical listing provided in Article 775 may be slightly different, it appears that if a trial judge grants a mistrial when when the jury is hopelessly deadlocked in either a federal or a Louisiana court, retrial of the defendant is not barred by the double jeopardy clause. The converse would also be true: if a trial judge improperly grants a mistrial against the objection of the defendant in either a federal court or a Louisiana Court, the double jeopardy cause would prohibit retrial of the defendant for the same offense.

> *Encalarde*, 579 So.2d at 991.

> In *Encalarde*, the facts regarding the jury deliberations were as follows:

>> At 6:39 P.M., the jury retired to deliberate. At 8:08 P.M., the jury returned

---

excerpt, July 9, 2014.

and requested additional information from the judge regarding the law on misdemeanor manslaughter. The judge provided additional information and the jury again retired to deliberate at 8:26 P.M.

Sometime shortly thereafter, the foreman contacted the minute clerk and explained that the jury wished to hear some illustrations of the judge's previous definitions of misdemeanor manslaughter. The minute clerk informed the trial judge that the jury requested additional information and that the jury was leaning toward an acquittal. When the jury was returned to the courtroom, the trial judge, however, asked the foreman whether the jury had reached a verdict. The foreman, Mr. Roland Gordon, responded, "No. judge. We are unable to reach a verdict." The court continued, "Do you feel that any further deliberations would serve any purpose?" And, Mr. Gordon responded, "I don't believe so." Judge Perez then asked the foreman if there was any movement among the jurors. Mr. Gordon responded, "No. We had movement earlier, but I don't' think we're going to get any further movement." The foreman also told the judge there had been no movement within the last forty-five minutes. The trial judge, without questioning the individual jurors and over adamant objections by defense counsel, granted a mistrial. The entire period of deliberations lasted slightly longer than two hours.

*Id.* at 990–91.

In *Encalarde*, we noted that there was no Louisiana case addressing the issue presented. Citing the jurisprudence from other state courts and the federal courts addressing the issue, we developed the following four-factor test to assess the trial court's decision to grant a mistrial:

  • Whether the trial court questioned the individual jurors or the jury as a group;
  • Whether the trial court allowed defense counsel to make arguments against granting a mistrial;
  • The length of the trial; and,
  • The length of the jury deliberations.

*Id.* at 991.

Applying the above four-factor test to the facts in *Encalarde*, we reasoned as follows:

  • The trial court failed to question the individual jurors or the jury as a group; instead, the trial court relied on the foreman's statements that the jury was unable to reach a verdict. *Id.* at 992. Also, "the foreman told the

11

trial judge that there had been no movement among the jurors for the past forty-five minutes, indicating that there had been movement prior to that time." *Id.*
• "The trial judge refused to allow the defense counsel to speak and present alternatives to a mistrial." *Id.*
• The trial lasted six and one-half days. *Id.*
• Jury deliberations lasted less than two hours and fifteen minutes. Stated otherwise, the trial court declared a mistrial at 9:28 P.M., after eight hours of closing arguments, jury charges, and jury deliberations. Moreover, the jurors had not had supper. *Id.*

Furthermore, we noted:

The judge was asked to provide illustrations to the jury regarding misdemeanor manslaughter. The judge was not informed by the minute clerk that the jury was deadlocked, yet when the judge returned to court, he did not provide additional illustrations to the jury but asked whether the jury was deadlocked. The judge knew at this time that the jury was leaning toward acquittal.

*Id.* Based on the above analysis, we held that the trial court erred in granting the mistrial over the defendant's objection. We thus granted the defendant's motion to quash based on double jeopardy.

Mr. Copelin contends that the circumstances here present a stronger case than in *Encalarde* for concluding that the district court erred when it declared a mistrial. He points out that the jury's note did not suggest that that they were deadlocked; rather, their note suggested that they would be unable to reach "a final decision tonight." He contends that when the district court asked the foreman whether further deliberations would be beneficial in reaching a verdict, it was reasonable for the foreman to believe that the question was posed in the context of whether further deliberations would be beneficial in reaching a verdict that night. Mr. Copelin thus suggests that this court should judge the district court's decision to declare a mistrial against the backdrop of a jury that never indicated it was deadlocked.

According to Mr. Copelin, the district court, at best, could have found that the jury was unable to reach a verdict "that night." He emphasizes that only seven minutes before the district court declared a mistrial, the foreman had indicated that the jury was not deadlocked and that further deliberations would be beneficial. He also emphasizes that the district court failed to consult with individual jurors and failed to consult with him on possible alternatives to declaring a mistrial. Mr. Copelin thus submits that the district court failed to scrupulously determine that the jury was genuinely deadlocked. Given the

totality of the circumstances, he contends that the district court abused its discretion by declaring a mistrial rather than dismissing the jury for the night with instructions to return the next day to resume their deliberations.

The State does not address the *Encalarde* case.[23]   Rather, the State counters that the district court legally ordered the mistrial, pursuant to La. C.Cr.P. art. 775, after the jury was unable to agree upon a verdict. Moreover, the State argues that it was incumbent upon Mr. Copelin to object, or at least seek some clarification, when the issue of the jury's deadlocked status arose that night. The State suggests that Mr. Copelin could have insisted the district court determine whether the jury was permanently deadlocked before excusing the jury and declaring a mistrial. Finally, the State contends that Mr. Copelin failed to preserve the issue for review by invoking La. C.Cr.P. art. 775.1 to seek immediate review of the district court's mistrial ruling; Article 775.1 provides as follows:

> If a judge orders a mistrial, then upon motion of either the state or the defendant, the court shall order an automatic twenty-four-hour stay of all proceedings in which either the state or the defendant may take an emergency writ application to the appropriate reviewing courts with appellate jurisdiction, including the Louisiana Supreme Court. The jury shall not be released pending the stay unless both the state and defendant agree to release the jury.

In his reply brief to this court, Mr. Copelin responds that it is doubtful that Article 775.1 applies to mistrial orders made *sua sponte* without a defendant's consent. In support, he cites *State v. Joseph*, 434 So.2d 1057 (La. 1983), and *State v. Simpson*, 371 So.2d 733 (La. 1979). Although he acknowledges he did not object once the district court dismissed the jury, he contends he was not required to do so. Moreover, he contends that the district court denied him an opportunity to urge alternatives to discharging of the jury.

In support, Mr. Copelin quotes the Louisiana Supreme Court's holding in *Joseph* that "the failure of the defendant to object to a mistrial which he had not sought and from which he [h]as not benefitted [is] inconsequential since once a mistrial is declared the trial is over"; in such a case, "the absence of a contemporaneous objection would not bar a plea of double jeopardy urged at the commencement of a second trial." 434 So.2d at 1059–60 (citing *Simpson*,

---

[23]   We note that the circumstances of this case are distinguishable from *Encalarde* in two respects. First, the trial here was significantly shorter—two days opposed to six. Second, the length of the deliberations here were significantly longer—five hours as opposed to two.

371 So.2d at 736).[24]  Mr. Copelin submits that such is the case here. For the same reasons, he contends that the district court deprived him of the option of invoking Article 775.1 by simultaneously granting the mistrial and discharging the jury.

There is scant jurisprudence construing, or even citing, Article 775.1, which was enacted in 2004.[25]  In *Joseph*, which was decided a decade before the enactment of Article 775.1, the Supreme Court addressed the issue of whether a defendant's failure to voice any objection to the trial court's *sua sponte* order of mistrial precludes the defendant from raising the issue on appeal.[26]  Finding it does not, the Supreme Court reasoned that the defendant's failure to lodge a contemporaneous objection was "inconsequential since once a mistrial is declared the trial is over." *Joseph*, 434 So.2d at 1060. In so holding, the Supreme Court cited its prior holding in *Simpson* in which it reasoned as follows:

---

[24]  *See also State v. Degrate*, 25,732 (La. App. 2 Cir. 3/30/94), 634 So.2d 965, 968 (finding improper grant of mistrial raised double jeopardy bar despite absence of objection and stating that "the absence of a contemporaneous objection does not bar a subsequent plea of double jeopardy when the first trial ends in a mistrial by the district judge's own motion, and when the motion does not benefit the accused.")

[25]  *See State v. Marlowe*, 10–1116, p. 30 (La. App. 4 Cir. 12/22/11), 81 So.3d 944, 963, discussing the *Joseph* and *Simpson* cases at length and mentioning the fact the State had attempted to invoke Article 775.1, but finding that when the trial court stated "Motion granted. Motion granted. I have to grant a mistrial," the court did not grant the motion for mistrial.)

[26]  In *Joseph*, *supra*, the trial court declared a mistrial, *sua sponte*, after the State rested—apparently due to its concern over the State not having presented evidence to rebut the defendant's testimony that he had not freely confessed to the crime. The defendant, being tried for attempted second degree murder, had not sought the mistrial and did not object after the trial court declared the mistrial. Before defendant's second trial commenced, he filed a motion to quash based upon double jeopardy, which the trial court denied. The defendant was tried and found guilty as charged. On appeal, the defendant assigned as error the denial of his motion to quash. The Supreme Court agreed that the motion had merit, ruling, in general, that a plea of double jeopardy should be maintained when a defendant has been impermissibly deprived of his right to have his trial completed by the jury before which he had been placed in jeopardy, by the trial court's own granting of a mistrial without the defendant's express consent and without his interest having prompted the court's ruling. The Supreme Court thus reversed the defendant's conviction and sentence and dismissed the charge.

However, it is apparent that contemporaneous objection and reservation of a bill are not applicable to a plea of double jeopardy. As originally drafted, Article 841 did not require a bill to be reserved for "a ground for arrest of judgment under Article 859 ...," one of which is double jeopardy. Moreover, it is clear that requiring a contemporaneous objection to an improperly granted mistrial does not advance the purpose of the rule, which is to put the trial judge on notice of the alleged irregularity and to provide him with the opportunity to correct the problem during trial. *State v. Dupre*, 339 So.2d 10 (La. 1976); *State v. Charles*, 326 So.2d 335 (La. 1976). When a mistrial is declared, the jury is dismissed. (Compare the effect of granting a motion for acquittal, even when erroneously granted. *State v. Hurst*, 367 So.2d 1180 (La. 1979). Unless the defendant anticipates the declaration of a mistrial, the trial ends without the opportunity to object.

*Simpson*, 371 So.2d at 738. In *Joseph*, the Supreme Court also commented that "a function of the contemporaneous objection rule is to facilitate appellate review of adverse lower court rulings. Since appellate review does not in the normal course follow a trial aborted by the grant of a mistrial, this purpose is not served by the noting of an objection to the granting of a mistrial." 434 So.2d at 1060.

Read together, the *Simpson* and *Joseph* cases have the untenable effect of making the declaration of a mistrial insusceptible to review and thus create a predicament under which an aggrieved party must anticipate the declaration of a mistrial. Stated otherwise, these cases hold that a trial court's declaration of a mistrial is an immediate, irrevocable disposition that cannot be undone or recalled. By enacting Article 775.1, which became effective in 2004 (La. Acts 2004, No. 413 § 1), the Louisiana Legislature, in effect, abrogated the holdings in *Simpson* and *Joseph*.

By imposing an automatic stay when invoked, Article 775.1 precludes a trial court from simultaneously granting a mistrial and dismissing the jury and thereby depriving the aggrieved party from seeking appellate review. Indeed, the apparent purpose for enacting Article 775.1 was to create a procedural device for the aggrieved party to preserve the status quo pending an appellate court's ruling on the issue. An aggrieved party's remedy is not to seek reconsideration of the issue before the trial court; rather, their remedy is to request a twenty-four hour automatic stay of the proceedings—thereby delaying the release of the jury—in order to file an emergency writ application with the appropriate appellate court and, if necessary, the Louisiana Supreme Court.

The Louisiana Supreme Court has repeatedly held that an irregularity or error

cannot be availed of after the verdict unless it was objected to at the time it occurred; and, as enacted, Article 775.1 preserves the contemporaneous objection rule with respect to the declaration of a mistrial. *See* La. C.Cr.P. art. 841; *State v. Lanclos*, 07–0082 (La. 4/8/08), 980 So.2d 643.

Contrary to Mr. Copelin's contention, if he had invoked Article 775.1, the district court could not have simultaneously granted a mistrial and discharged the jury. If he had invoked Article 775.1, it would have resulted in an automatic stay; the district court would have been mandated to instruct the jury that its ruling granting the mistrial was not final. As a result, the jury would have been ordered to return the next day for the appellate court's ruling on the emergency writ. Given Mr. Copelin failed to object or to invoke the appropriate remedy provided for by Article 775.1, we find the assignment of error was not preserved for review.[27]

The Louisiana Supreme Court subsequently denied relief without additional stated reasons.

"A State may not put a defendant in jeopardy twice for the same offense.    The constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal."    *Arizona v. Washington*, 434 U.S. 497, 503 (1978) (citation omitted). However, "[u]nlike the situation in which the trial has ended in an acquittal or conviction, retrial is not automatically barred when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused."    *Id.* at 505.    As the Supreme Court has contemplated, it may be necessary to discharge a jury before trial is completed for many different reasons, among them, a hung jury.    *Id.*

"[T]he *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings."    *United States v. Jorn*, 400 U.S. 470, 485 (1971) (citing *United States v. Perez*,

---

[27] *State v. Copelin*, 206 So.3d at 995-1001 (footnotes in original).

9 Wheat. 579, 580, 6 L.Ed. 165 (1824)).    Since *Perez*, the Supreme Court has interpreted the "manifest necessity" standard as a " 'high degree' " of necessity.    *Arizona v. Washington*, 434 U.S. at 506.    And in weighing "necessity," the Supreme Court has recognized that "whether that 'high degree' [of necessity] has been reached is answered more easily in some kinds of cases than others."    *Washington*, 434 U.S. at 507.    On the wide spectrum, the Court compared "one extreme, [of] cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence," where the strictest scrutiny is appropriate, to the "other extreme, [where] the mistrial is premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial."    *Id.* at 508-09.    The Supreme Court distinguished the deadlocked jury situation, in which broad discretion is afforded the trial judge:

> The argument that a jury's inability to agree establishes reasonable doubt as to the defendant's guilt, and therefore requires acquittal, has been uniformly rejected in this country. Instead, without exception, the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial. This rule accords recognition to society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws.
>
> Moreover, in this situation there are especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not "manifest necessity" justifies a discharge of the jury. On the one hand, if he discharges the jury when further deliberations may produce a fair verdict, the defendant is deprived of his "valued right to have his trial completed by a particular tribunal." But if he fails to discharge a jury which is unable to reach a verdict after protracted and exhausting deliberations, there exists a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. If retrial of the defendant were barred whenever an appellate court views the "necessity" for a mistrial differently from the trial judge, there would be a danger that the latter, cognizant of the serious societal consequences of an erroneous ruling, would employ coercive means to break the apparent deadlock. Such a rule would frustrate the public interest in just judgments. The trial judge's decision

> to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court.

*Washington*, 434 U.S. at 509-10 (footnotes omitted).   Under controlling federal law, the deadlocked or hung jury situation, as occurred here, is the quintessential example of manifest necessity and presents especially compelling reasons for allowing the trial judge much discretion in declaring a mistrial.    *Blueford v. Arkansas*, 566 U.S. 599, 609 (2012); *Renico v. Lett*, 559 U.S. 766, 773-74 (2010); *Washington*, 434 U.S. at 510 n. 28; *United States v. Sanford*, 429 U.S. 14, 15-16 (1976).

The Supreme Court has never required " 'mechanical application' " of any " 'rigid formula' " by a trial judge in deciding whether jury deadlock requires a mistrial.    *Renico v. Lett*, 559 U.S. at 775.   The trial judge need not make explicit findings on the record of manifest necessity, articulate reasons supporting the mistrial, or follow any particular requirements, such as "forc[ing] the jury to deliberate for a minimum period of time, question[ing] the jurors individually, consult[ing] with (or obtain[ing] the consent of) either the prosecutor or defense counsel, issu[ing] a supplemental jury instruction or consider[ing] any other means of breaking the impasse," when exercising its broad discretion.    *Id.*

Here, the basis for Copelin's double jeopardy claim is that the trial judge at his first trial erroneously declared a mistrial without his consent and discharged the jury.   He disputes the trial judge's exercise of authority under circumstances he claims were ambiguous and did not show that the jury was "truly and genuinely deadlocked," to establish "manifest necessity" for the mistrial.[28]   However, as the state courts held, the subsidiary

---

[28]  Rec. Doc. 11, pp. 15-16.

and intertwined claim that the mistrial was improper was not properly preserved under state law.    He was not entitled to review of that claim on the merits because he failed to challenge that ruling contemporaneously by invoking Louisiana Code of Criminal Procedure article 775.1.    Consequently, the double jeopardy claim fails on the merits because it is premised on his contention that the prior mistrial ruling was improper and an abuse of discretion.    That mistrial issue has been waived and may not be challenged in this federal forum.    By waiving the mistrial claim, the mistrial is now deemed proper under state and federal law due to a deadlocked jury.    Because Copelin has not proven that his first mistrial was an abuse of discretion, and because he cannot ever make that showing because he has waived the issue, the double jeopardy claim necessarily fails on the merits.    Copelin has not demonstrated that the state-court decision denying his double jeopardy claim was either contrary to, or an unreasonable application of, clearly established federal law. Accordingly, he is not entitled to habeas relief on this claim.

   B. *"Other Crimes" Evidence*

       Copelin's next claim concerns the alleged improper admission of evidence regarding a 2002 bank robbery.[29]    He contends that the state court unreasonably applied harmless-error analysis to conclude that despite the erroneous admission of evidence under Louisiana Code of Evidence article 404(B), the error was harmless.

       On direct appeal, Copelin asserted that the state trial court improperly admitted

---

[29]  In May 2003, he pleaded guilty in federal court to one count of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d) and § 2 and entered a plea of "nolo contendere" to one count of brandishing a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1) and § 2. *United States v. Darrius Copelin*, 02-328 "C"(5) (E.D. La).

prejudicial evidence concerning the 2002 bank robbery.     He argued that the State used the "other crimes" evidence solely to show that he was a person of bad character and acted in conformity with his prior conduct.     In denying the claim, the appellate court found that although the trial court erroneously admitted the evidence at trial, the error was harmless.

The appellate court first analyzed whether the evidence of other crimes was properly admitted under Louisiana Code of Evidence article 404(B)(1), to prove either identity (*modus operandi*) or system or pattern (*res gestae*), and concluded it was not:

> Mr. Copelin's second, and final, assignment of error is that the district court erred in allowing the State to introduce impermissible other crimes evidence. The general rule in Louisiana is that "evidence the accused committed crimes, wrongs or acts, other than the one charged is inadmissible when its only purpose is to prove the defendant's character and therefore his disposition to break the law." Gail Dalton Schlosser, LA. CRIM. TRIAL PRAC. § 20:25 (4th ed.); *see also State v. Garcia*, 09–1578, p. 53 (La. 11/16/12), 108 So.3d 1, 38; *State v. Brown*, 03–1616, p. 6 (La. App. 4 Cir. 3/31/04), 871 So.2d 1240. The underlying rationale for this rule is that "the prejudicial tendency of such evidence outweighs its probative value because the finder of fact is likely to convict on the basis that the defendant is a 'bad person' rather than the strength of evidence against him in the case being tried." *State v. Lawrence*, 45,061, p. 12 (La. App. 2 Cir. 3/3/10), 32 So.3d 329, 337 (citing *State v. Brown*, 318 So.2d 24 (La. 1975)).[30]
>
> The introduction of other crimes evidence is governed by La. C.E. art. 404(A), which provides (with exceptions) that "[e]vidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion."

[30]  Since the *Prieur* decision, the Louisiana Supreme Court consistently has "treated the rule respecting the admissibility of other crimes evidence as a rule of exclusion. Under the long-settled and prevailing jurisprudence, evidence of another similar crime or act should be excluded unless the State meets certain criteria." *State v. Hardy*, 14–1569, p. 2 (La. 11/21/14), 154 So.3d 537, 540 (Weimer, J., dissenting). The federal courts, in sharp contrast, treat other crimes evidence as a rule of inclusion. *Hardy*, 14–1569 at p. 2, n. 4, 154 So.3d at 540 (noting the federal courts deem "Federal Rule of Evidence 404(b) 'a rule of inclusion,' by which 'evidence of a prior crime should be excluded only when its sole relevance goes to the character of the defendant.' *United States v. Foster*, 344 F.3d 799, 801 (8th Cir. 2003).").

Likewise, La. C.E. art. 404(B) prohibits evidence of other crimes, wrongs or acts to prove the character of a person. Such evidence, however, is admissible if the State proves an independent reason. *Id.* The exception is codified in La. C.E. art. 404(B)(1), which provides as follows:

> Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

The Louisiana Supreme Court in *State v. Taylor*, 16–1124, 16–1183 (La. 12/1/16), ––– So.3d ––––, 2016 WL 7030750, enumerated the following principles that govern the introduction of other crimes evidence in this state:

• "Code of Evidence article 404(B)(1) embodies the settled principle that evidence of other crimes may be admissible if the state establishes an independent and relevant reason for its admission."

• "[T]he clear and convincing burden of proof set forth in *Prieur* is no longer mandated"; instead, the Court held that the State need only make a showing of "sufficient evidence" of the defendant's commission of the other crime, wrong, or act.

• "[O]ther jurisprudential rules and guidelines derived from *Prieur* and its progeny remain valid and applicable."

• "[F]or other crimes evidence to be admissible, the state must comply with the notice requirement set out in *Prieur*."

• "[A]t a pre-trial hearing, the state must provide sufficient evidence to support a finding that the defendant committed the other crime, wrong, or act, and to demonstrate that the other act satisfies one of the requirements listed in La. C.E. art. 404(B)(1)."

• "Moreover, even when the other crimes evidence if offered for a purpose allowed under Article 404(B)(1), the evidence must have substantial relevance independent from showing defendant's general criminal character and thus is not admissible unless it tends to prove a material fact at issue or to

rebut a defendant's defense."

• "It is the duty of the district court in its gatekeeping function to determine the independent relevancy of this evidence."

• "The [pre-trial] hearing allows the district court to perform its gatekeeping function of determining the relevancy of the other crimes evidence and balancing its probative value against its prejudicial effects pursuant to Article 403."

*Id.* A trial court's determination of admissibility of other crimes evidence is reviewed under an abuse of discretion standard. *Garcia*, 09–1578 at p. 55, 108 So.3d at 39.

In its *Prieur* notice that it filed in the earlier case, Case No. 513–845 "I", the State set forth the other crimes evidence it intended to introduce as follows:

> On May 29, 2003, the defendant pled guilty to armed robbery with a firearm in the United States District Court for the Eastern District of Louisiana [in Case No. 02–328 "C"]. In that case, the defendant and another male held up a Capital One bank teller on October 30, 2002. Approximately one week before the robbery, the getaway driver was approached by Darrius Copelin with a plan to rob the bank. On the morning of October 30, 2002, Copelin and two other people drove to the Capital One Bank at 7033 Canal Boulevard with the intent to commit a robbery. Copelin was armed with a shotgun and [was wearing] a ski mask. Copelin forced a bank employee to turn off the alarm and hit a security camera to shield his face. Copelin was unsuccessful in robbing the bank because the teller was unable to open the bank vault. Copelin fled the scene and discarded the shot gun. Money belonging to the bank teller was recovered from Copelin's co-defendant. At some point during the robbery, Copelin placed his shotgun to the back of the teller's head and threatened to shoot him. Copelin then began to kick the teller while he laid on the floor. Copelin was later apprehended. The shotgun was recovered. Copelin admitted to the authorities that the bank robbery was his idea.

In in [sic] its *Prieur* notice, the State argued that both the 2002 bank robbery and the instant 2012 bar robbery were factually similar. The State cited three things the two crimes had in common—in both, the robber brandished a gun; in both, the robber wore a ski mask; and in both, the robber fled the scene after putting a gun to the victim's head. Following a hearing, the district court in the first case found the *Prieur* evidence would "serve a purpose during the course of the trial" and that the evidence was more probative than prejudicial. The

district court thus held the evidence was admissible. Mr. Copelin noted his objection. This issue was not raised again until the instant appeal.[31]

On appeal, Mr. Copelin assigns as error the district court's allowing the State to present evidence regarding his conviction for the 2002 bank robbery, which he contends the State used solely to show that he committed the instant crime in conformity with his prior conduct. Mr. Copelin contends that neither in the district court nor in this court has the State been able to identify a legitimate purpose for the other crimes evidence, and none exists. He thus contends that the evidence should not have been admitted.

The State counters that the other crimes evidence was properly admitted. In support, the State, in its appellate brief, offers the following reasons supporting its introduction of the other crimes evidence:

• The evidence demonstrates that Mr. Copelin "is the individual who committed the armed robbery at issue in the instant case." In support of this contention that the evidence is admissible under the identity exception, the State maintains that the instant crime and the prior crime are "strikingly similar."

• The evidence shows "that defendant must have adverted to the prescribed criminal consequences as reasonably certain to result from his actions." The State thus contends the evidence is admissible under the intent exception.

• The evidence is relevant to show "defendant's access to a weapon and his ease and lack of hesitation in using a weapon."

• The prior bank robbery and the instant offense were part of a "system" or "pattern." The State notes that the armed robbery at issue in the present case occurred only nineteen days after Mr. Copelin's release from prison on the 2002 robbery. The State further notes that "[p]art of the State's theory of the case was that Copelin was a professional robber and that he quickly returned to a pattern of crime shortly after his

---

[31] As noted elsewhere in this opinion, the State filed a *Prieur* notice in the first case. A new *Prieur* notice was not filed in this case. Nonetheless, Mr. Copelin voiced no objection to the State's failure to file a *Prieur* notice in connection with this case. Given our ultimate conclusion that the admission of the other crimes evidence was harmless error, we do not address this procedural issue. For the same reason, we do not address the State's contention that Mr. Copelin's failure to make a contemporaneous objection to the introduction of the *Prieur* evidence at trial resulted in a waiver.

release from federal prison." The jurisprudence the State cites in support of its argument that the system or pattern exception applies is grounded on the *res gestae* exception.[32]

Intent is not at issue here; as Mr. Copelin points out, "[t]he person who entered the bar, wearing a mask, brandishing a gun, and demanding money obviously intended to commit the crime." Likewise, Mr. Copelin's access to a weapon and his lack of hesitation to use one is not at issue here; as Mr. Copelin points out, he "did not defend himself by claiming he had no access to weapons or did not know how to point a gun at somebody." Thus, only two of the four grounds enumerated by the State—identity (referred to as *modus operandi*) and system or pattern (based on the *res gestae* exception)—require analysis. We thus confine our analysis to those two exceptions, which we address below.

*Modus operandi*

The Louisiana Supreme Court has noted that it "has long sanctioned the use of other crimes evidence to show *modus operandi*, as it bears on the question of identity, when the prior crime is so distinctively similar to the one charged, especially in terms of time, place, and manner of commission, one may reasonably infer the same person is the perpetrator in both instances." *Garcia*, 09–1578 at pp. 56–57, 108 So.3d at 39–40; *State v. Lee*, 05–2098, pp. 44–45 (La. 1/16/08), 976 So.2d 109, 139. The Supreme Court, however, has cautioned that "[t]he identity exception to inadmissibility under Article 404 B must be limited to cases in which the crimes are genuinely distinctive; otherwise, the rule may be swallowed up with identity evidence exceptions. *State v. Bell*, 99–3278, p. 5 (La. 12/8/00), 776 So.2d 418, 421 (citing George W. Pugh et al, HANDBOOK ON LOUISIANA EVIDENCE LAW, Official Comments to Article 404(B), cmt. (6)(1988)).

Mr. Copelin contends that the similarities between the two offenses fall far short of establishing a unique *modus operandi*. We agree. The two offenses are distinctively dissimilar. One involved a bank robbery early in the morning; the other, a bar robbery late at night. In the previous offense, Mr. Copelin, armed with a shotgun, along with two accomplices, attempted to gain access to a bank vault by threatening an employee who they knew would arrive well before any

---

[32] *See State v. Tarleton*, 545 So.2d 1195, 1198 (La. App. 4th Cir. 1989) (testimony of second armed robbery victim was admissible against defendant accused of armed robbery under res gestae exception to rule barring admission of evidence of other crimes; defendant's armed robbery of second victim was factor leading to his identification and arrest and extremely relevant to show his connexity with stolen property of complaining victim); *State v. Brown*, 03–1616, p. 10 (La. App. 4 Cir. 3/31/04), 871 So.2d 1240, 1249.

other employees and before the bank opened for business. Mr. Copelin also used his knowledge of the employee's family, including the high school his daughter attended, in an attempt to force the employee to open the vault. By contrast, the instant offense involved the single-handed, late-night robbery of a crowded bar. The *modus operandi* of these two offenses are distinctly different.

Furthermore, as Mr. Copelin contends, the similarities offered by the State, especially the use of a gun and the wearing of a mask, fail to set Mr. Copelin's *modus operandi* apart from countless other robberies. *See State v. Williams*, 99–2576, p. 11 (La. App. 1 Cir. 9/22/00), 769 So.2d 730, 736–37 (noting that "it is beyond question that the use of a handgun is a common aspect of many armed robberies.").[33] The sole similarity between the two offenses that is remotely distinctive is the act of placing a gun to someone's head during the robbery. This singular similarity between the two offenses, however, is insufficient to support a reasonable conclusion that these were the acts of the same person. The State's reliance on the *modus operandi* exception is thus misplaced.

*Res gestae*

The *res gestae* exception is codified in La. C.E. art. 404(B)(1), which provides for admission of evidence of other crimes "when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding." La. C.E. art. 404(B)(1); *Brown*, 03–1616 at p. 10, 871 So.2d at 1249 (noting that "[t]he last sentence of La. C.E. art. 404(B)(1) is the codification of the principle of *res gestae*."). Simply put, *"[r]es gestae* events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them." *State v. Taylor*, 01–1638, p. 10 (La. 1/14/03), 838 So.2d 729, 741.

Explaining the *res gestae* exception, the Louisiana Supreme Court has noted:

> This Court has approved the admission of other crimes evidence when it is related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference

---

[33]  Indeed, Mr. Copelin, acting as his own counsel, questioned two of the State's witnesses—Agent Jeffrey Hurm and FBI Special Agent Sandra Zulli—whether things like gloves, masks, and of that nature are common attire in robberies. Agent Hurm said it might be "50/50" of them. Agent Zulli said she had seen a variety of things and could not say statistically if it was common.

to it. *State v. Boyd*, 359 So.2d 931, 942 (La.1978); *State v. Clift*, 339 So.2d 755, 760 (La.1976). In such cases, the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. McCormick, LAW OF EVIDENCE 448 (2d ed. 1972). The concomitant other crimes do not affect the accused's character, because they were done, if at all, as parts of a whole; therefore, the trier of fact will attribute all of the criminal conduct to the defendant or none of it. And, because of the close connection in time and location, the defendant is unlikely to be unfairly surprised.

*State v. Haarala*, 398 So.2d 1093, 1097 (La. 1981).

According to the State, the story the evidence was needed to complete is that Mr. Copelin was a professional robber and that he quickly returned to a pattern of crime shortly after his release from federal prison. Mr. Copelin counters that the charged bar robbery cannot reasonably be regarded as part of system or pattern stemming from a single bank robbery committed more than a decade earlier. We agree. Although Mr. Copelin was released from prison days before the bar robbery, the bank robbery at issue occurred a decade earlier. Given the temporal separation between the two crimes, we find the State's reliance on the *res gestae* exception is misplaced.

The Louisiana Fourth Circuit went on to hold that the error was harmless:

Regardless, the erroneous admission of other crimes evidence is subject to a harmless error analysis. *See* La. C.Cr.P. art. 921; *State v. Johnson*, 94–1379, pp. 14–15 (La. 11/27/95), 664 So.2d 94, 100–01 (errors leading to improper admission of evidence subject to harmless-error analysis; error harmless if verdict "surely unattributable" to error) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)).[34] "[A]n error is

---

[34] In *State v. Ruiz*, 06–1755, p. 7 (La. 4/11/07), 955 So.2d 81, 86, the Louisiana Supreme Court defined the erroneous introduction of other crimes evidence as a "trial error," reasoning as follows:

Trial error occurs during the presentation of the case to the trier of fact and may be quantitatively assessed in the context of the other evidence to determine whether its admission at trial is harmless beyond a reasonable doubt. *State v. Maise*, 00–1158, p. 8 n. 5 (La. 1/15/02), 805 So.2d 1141, 1148 n. 5, citing *Arizona v. Fulminante*, 499 U.S. [279] at 307–311, 111 S.Ct. [1246] at 1264–1265 [113 L.Ed.2d 302 (1991) ]. The erroneous introduction of evidence relating to defendant's prior bad acts risks "lur[ing] the fact-finder into declaring guilt on a ground different from proof specific to

harmless if it is unimportant in relation to the whole and the verdict rendered was surely unattributable to the error." *State v. Blank*, 04–0204, p. 53 (La. 4/11/07), 955 So.2d 90, 133.

In determining whether an error is harmless in a given case, a host of factors, readily accessible to reviewing courts, are considered. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). Factors to be considered include the importance of the evidence to the State's case, the presence or absence of additional evidence corroborating or contradicting the evidence, and the overall strength of the State's case. *Id.*; *State v. Harris*, 97–0300, p. 3 (La. 4/14/98), 711 So.2d 266, 269.

To provide a background for analyzing the harmless error issue, we first outline the evidence presented at trial. We divide our summary of the evidence into four categories: (i) the prior offense, (ii) victims of the instant offense, (iii) the investigation of the instant offense, and (iv) the audio evidence of the instant offense. We briefly summarize the testimony regarding each category.

*Prior offense*

FBI Special Agent Sandra Zulli testified that, in October 2002, she investigated a robbery of a bank located on Canal Street in New Orleans. Mr. Copelin provided Agent Zulli with a statement regarding his role in the crime. Mr. Copelin stated that he planned the robbery; that he solicited a friend to assist him; and that his friend, in turn, solicited a third person to participate in the robbery. After casing the location, Mr. Copelin learned that a financial consultant for the bank would routinely arrive at the bank before anyone else. The consultant's routine was to drop his daughter off at school and then proceed to work.[35]   Once he arrived at work, he would park in the rear of the bank and enter through the front door, for which he had a key.

During the robbery, Mr. Copelin wore a long, dark jacket; a ski mask; and latex

---

the offense charged ... [by] generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged...." *State v. Womack–Grey*, 00–1507, p. 1 (La. 12/7/01), 805 So.2d 1116, citing *Old Chief v. United States*, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997). The erroneous introduction of evidence of other crimes is a trial error, which may be qualitatively assessed in the context of the other evidence to determine whether its admission was harmless beyond a reasonable doubt. *Johnson*, 94–1379 at p. 15, 664 So.2d at 101.

[35]  The consultant's daughter attended high school at Mount Carmel Academy.

gloves. He carried a twelve-gauge shotgun, which he concealed beneath his jacket. Apparently, Mr. Copelin and his accomplice, who carried a glock semiautomatic pistol, followed the consultant into the bank as he entered it that morning. The men demanded that the consultant open the vault, but the consultant told them that he did not have a key. He explained to them that he could not open the vault until the two bank managers arrived at 8:30 a.m. At this point, Mr. Copelin put a gun to the back of the consultant's head and told him that they knew he had the keys. He told him that they knew that his daughter went to Mount Carmel Academy, that he had a wife, and that the next time he saw them they would have his wife and child. The consultant, however, did not have the keys.

At this point, the men picked up the consultant and brought him to the rear of the bank. The consultant's office was located upstairs. Mr. Copelin stayed at bottom of the stairs while his accomplice brought the consultant up the stairs to his office. After telling his accomplice that they needed to go, Mr. Copelin fled through the rear door of the bank. He ran through the adjoining neighborhood and hid. The NOPD responded to an alarm at the bank; an exhaustive chase for the perpetrators ensued. The NOPD located Mr. Copelin. He told Agent Zulli and the officers where he hid the gun and his clothes.

Agent Jeffrey Hurm, a federal probation officer, testified that he supervised Mr. Copelin after he was released from serving time in federal prison on the 2003 armed robbery conviction. Agent Hurm testified that Mr. Copelin pled guilty on May 29, 2003, to federal charges of bank robbery and brandishing a firearm during a crime of violence. He explained that Mr. Copelin was granted supervised release on August 21, 2012, before the completion of his sentence, and ordered to report to him. Agent Hurm explained that the standard conditions of Mr. Copelin's release included that he could not possess a firearm or associate with a convicted felon.

Mr. Copelin was on supervised released for approximately two and one-half weeks before being arrested for the robbery of the Homedale Inn. Agent Hurm testified that after he was notified of Mr. Copelin's arrest for a state armed robbery charge, he requested that a federal district court judge issue a warrant for Mr. Copelin to be held as a detainer, which the judge signed.

*Victims of the instant offense*

Both the bartender, Jennifer Gostl, and the bar owner, Perry Putfark, testified at trial regarding the details of the robbery. Ms. Gostl testified that she had been working at the Homedale Inn for several years. She described the bar as "neighborhood-friendly bar" that is "kind of like an extension of most people's living room." Indeed, when the robber entered the bar, she initially thought it

was a bad joke; however, as the robber got closer to her, she realized it was serious. She explained that the robber had the gun in her face and that he also put the gun up against the one of the patrons' head.

According to Ms. Gostl, the bar was busy on the night of the robbery. Mr. Putfark estimated that there were approximately fifteen to twenty patrons inside the bar at the time of the robbery. When the robber entered the bar at about 1:30 a.m., Ms. Gostl was standing at the end of the bar near the door and just a few feet from the robber; Mr. Putfark was at the end of the bar talking to a few customers. The robber threw a backpack towards the bar and said, "Fill it up." The backpack hit Mr. Putfark on the arm and fell to the ground. The robber bent down to pick up the backpack; when he came up, Mr. Putfark could see that he was holding a gun, which he described as a black semi-automatic pistol, "approximately 9–millimeter." The robber grabbed Mr. Putfark's sleeve to move him out of the way so he could move closer to the bar. Mr. Putfark said "okay," and he walked past the robber with his hands up and then towards the other end of the bar. Mr. Putfark then went behind the bar, opened a cabinet, and removed the gun he kept there, which he held to his side.

Contemporaneously, Ms. Gostl complied with robber's demands; she brought the knapsack to the cash register and filled it up with money (about $1,000). While Ms. Gostl was at the register, Mr. Putfark approached the register and triggered the silent alarm located on the side of the cash register, which calls the police. After Ms. Gostl handed the knapsack with the money to the robber, he backed up out the door while pointing the gun at everyone inside and telling them "[y]ou-all don't mess with me and I won't mess with you all." The robber then fled. Ms. Gostl called 911.

Meanwhile, the patrons yelled for Mr. Putfark to lock the door, which he did. Within seconds, however, Mr. Putfark opened the door and went outside to see in which direction the robber had fled. After he exited the bar, the robber turned left and ran in the direction of Hawthorne Street where he turned right. At about that time, a police car pulled up.

*Investigation of the instant offense*

Deputy Kevin Wheeler was the first officer to arrive on the scene. He testified that on September 9, 2012, he was an NOPD officer working the Lakeview Crime Prevention assignment when he received a call over his police radio that the Homedale Inn had been robbed. At that time, he was only about three quarters of a mile from the Homedale Inn, which was located on Homedale Street. He arrived at the bar in less than a minute after receiving the call. When he turned the corner onto Homedale Street, he saw a number of patrons yelling and pointing. He exited his car for a second. The patrons told him that

the robber "went that way, he ran that way," and they pointed towards Hawthorne Street. Deputy Wheeler returned to his car, drove down Homedale Street, and turned onto Hawthorne Street. The first thing he noticed after making the turn was a vehicle parked on the right side of the street.

According to Deputy Wheeler, the vehicle was parked away from the curb and thus impeding traffic. The vehicle had a temporary license plate in the window, the driver's seat was fully reclined, and the keys were on the dash. The manner in which the vehicle was parked, the temporary license plate, coupled with and the manner in which the keys were left on the dash caused Deputy Wheeler to be suspicious of its presence so close to the scene of the robbery. Deputy Wheeler canvassed the area and knocked on doors in the neighborhood to see if the vehicle belonged to anyone who lived in the area. None of the residents owned or were familiar with the vehicle. Deputy Wheeler touched the hood of the vehicle and felt that it was "more than warm"; the vehicle thus had just been parked there. At this point, Deputy Wheeler elected to have the vehicle towed because it was impeding traffic.

Before the vehicle was towed, Deputy Wheeler performed an inventory search. In the center console, he discovered a wallet containing Mr. Copelin's driver's license and other identification. He also located a watch and a cell phone inside a black case on the passenger seat. The vehicle was then towed and impounded. According to Officer Wheeler, if he had not been dispatched to the armed robbery and arrived at the scene in less than a minute, Mr. Copelin would have used the vehicle to escape.

The investigation of the robbery was assigned to Detective Alfred Harris. Detective Harris was one of the next officers to arrive on the scene; he arrived approximately five to ten minutes after receiving the call. He spoke with the victims and obtained a description of the robber. He then relocated to the 5100 block of Hawthorne Street. There, he observed the vehicle impeding the flow of traffic; and he spoke with Officer Wheeler.

On the following day, Detective Harris learned that the vehicle had been reported stolen. He elected to conduct a follow-up investigation with the person who reported the vehicle stolen, Ms. Howard. (As discussed elsewhere, Ms. Howard was Mr. Copelin's girlfriend.) Detective Harris found the stolen vehicle report suspicious given the keys were found inside the vehicle. Before speaking with Ms. Howard, Detective Harris ran Mr. Copelin's name in the computer. He learned that Mr. Copelin had a prior conviction for a 2002 armed robbery and was incarcerated for several years following his 2003 conviction for that offense. Mr. Copelin had been released from federal prison only nineteen days before the bar robbery. Detective Harris, along with Detective Bianca DeIrish, then relocated to Ms. Howard's residence.

The detectives knocked on Ms. Howard's door and explained to her that they were there to follow up on her stolen vehicle report. Initially, Ms. Howard would not let them enter the residence; their initial conversation with her was carried out through the peephole. Eventually, Ms. Howard allowed the detectives into her residence. While the detectives were discussing the circumstances surrounding the disappearance of her vehicle, they heard rustling coming from the second floor. They asked Ms. Harris whether anyone else was in the residence; Ms. Harris replied no and stated that they were alone. As they continued questioning Ms. Howard regarding her vehicle, the detectives again heard a rustling noise coming from the second floor. The detectives asked Ms. Howard who else was in the home; Ms. Howard replied that it was her friend, "Darrius."

Given his knowledge of Mr. Copelin's criminal history, Detective Harris alerted Detective DeIrish that they might be in danger and drew his weapon. The detectives then proceeded to climb the stairs to the second floor. At that point, they observed someone run across the landing into a bedroom and slam the door. Detective Harris requested backup assistance. Additional officers arrived on the scene within five to ten minutes. They proceeded up the stairs and were able to convince Mr. Copelin to come out. Both Mr. Copelin and Ms. Howard were transported to the station for further questioning. According to Detective Harris, neither was under arrest at that point. At the station, Ms. Howard provided a formal statement. Thereafter, Mr. Copelin was arrested for the armed robbery of the Homedale Inn.

Ms. Howard's paid defense attorney, Jake Lemmon, was called by the State as a witness at trial. Mr. Lemmon testified that Ms. Howard was charged not only with being an accessory to armed robbery of the Homedale Inn, but also with three counts of perjury.[36] Mr. Lemmon further testified that he was present when Ms. Howard discussed her upcoming testimony with the District Attorney's office. He confirmed that the State had not offered Ms. Howard any plea to in return for her testimony. Mr. Lemmon explained that after Ms. Howard retained him, he reviewed her criminal history and the current charges she was facing. Given her criminal history, Mr. Lemmon noted that, if convicted of anything, Ms. Howard faced significant criminal penalties. He further explained that he made a professional determination that her best course of action, to avoid spending a great deal of time in prison and a multiple bill, was for her to testify truthfully at Mr. Copelin's second trial. Over Mr. Copelin's objection, the district court allowed Mr. Lemmon to remain in the

---

[36] The perjury charges were the result of Ms. Howard's false testimony at Mr. Copelin's first trial.

courtroom for Ms. Howard's testimony.

Ms. Howard, who was the State's next witness, testified that she met Mr. Copelin at a gym and that she subsequently learned they were both in a "halfway house together" after being released from federal prison. She characterized their relationship as an intimate one. [37] Ms. Howard acknowledged that she was a convicted felon and that her criminal history included a litany of convictions for forgery and credit card fraud. She confirmed that she had been charged in this case not only with accessory after the fact to the armed robbery, but also perjury for lying at Mr. Copelin's first trial. Ms. Howard testified that the reason she lied when she previously testified was "because of the streets, just worries about what people were going to have to say about me. I was also concerned about that I might be hurt by Darrius [Copelin] or anyone he is affiliated with." She confirmed that Mr. Copelin asked her to lie at the prior trial. She explained that he called her from jail two days before she was scheduled to testify and that he coached her on how to testify. One of the things he coached her to say was that she never saw a handgun; rather, she thought she saw he had a cell phone.

Addressing the stolen vehicle, Ms. Howard testified that the vehicle was registered in her grandmother's name. She explained that she had possession of the vehicle on September 8, 2012, and that Mr. Copelin spent that night at her house. When they went to bed together, the vehicle was parked in her driveway. When she awoke around 2:00 a.m., neither Mr. Copelin nor the vehicle was there. She immediately attempted to call his cellphone, but he did not answer. Between 3:00 a.m. and 4:00 a.m., he called her collect from a payphone sometime; however, she was unable to accept the call. Later that morning, he called again. The first thing he said was "I f'd up." She asked him what was going on; he replied that he had to leave the vehicle. He asked her to come to get him, and he gave her directions to an address on Montegut Street. She testified that she was living in New Orleans East.

Ms. Howard borrowed a relative's car and drove to the Montegut Street address. When she arrived, Mr. Copelin exited the house holding a gun. He was wearing black shirt, black pants, and black shoes; she described his clothing as dirty. Mr. Copelin got into the car and crouched down as she drove. He directed her to a location in the Canal Boulevard area. He told her that if the car was still there, "I am good. If the car is gone, I'm f---." As they drove down the street in question, Mr. Copelin was leaning back in his seat peering out the window,

---

[37] On cross-examination by Mr. Copelin, Ms. Howard, in responding to the question of what changed since the first trial, testified that she "didn't want to see [Mr. Copelin] go to jail" and that she was pregnant with his child.

but the car was gone.

According to Ms. Howard, Mr. Copelin told her that he was under a blue house for several hours that night. The blue house was located "maybe up the block, like, two houses off the corner" from the location where he had parked the car. Although he wanted to go under the blue house and retrieve the backpack he left there, Ms. Howard told him that she was not bringing him to go under a house to get money. Ms. Howard suggested to him that an undercover officer could be watching the house. She then brought Mr. Copelin back to the Montegut Street address, where she dropped him off. As they drove, Mr. Copelin told her to report the car stolen. He also told her that they needed to come up with a plan to avoid being arrested.

Following Mr. Copelin's instructions, Ms. Howard reported the vehicle as stolen later that day. She told the police that the keys were taken at a party. She also retrieved the vehicle from the auto pound. According to Ms. Howard, the police told her the vehicle was towed because it was parked illegally. When Mr. Copelin discovered that his cell phone and wallet were not in the vehicle, he instructed Ms. Howard to call the police to find out the whereabouts of his possessions. Ms. Howard, however, was unable to reach the investigating officer. Mr. Copelin and Ms. Howard then began plotting and formulated a story about him being at a strip club on the night of the crime and having the keys stolen from him.

As discussed earlier, the police found Mr. Copelin at Ms. Howard's residence and took both him and Ms. Howard into custody. After being advised of her rights, Ms. Howard gave a statement. In her statement, she informed the police that Mr. Copelin was involved in robbing a bar, that she picked him up from Montegut Street, and that she saw him with a handgun. After giving the statement; Ms. Howard was arrested and returned to federal prison for ten months because she violated her parole. While in federal prison, she learned that she had been charged with accessory after the fact to the armed robbery.

Akein Spots testified that Mr. Copelin came to his house one morning to use his phone and that Ms. Howard came to get Mr. Copelin. According to Mr. Spots, Mr. Copelin was wearing blue jeans and a white or gray t-shirt. He did not notice whether Mr. Copelin was carrying a gun.

*Audio evidence of the instant offense*[38]

---

[38]   The content of the audio evidence—the 911 calls and the jailhouse calls—is not in the record on appeal.

Jim Huey, an Orleans Parish Sheriff's Office employee, testified that he was the custodian of all recorded jail calls that inmates place while incarcerated. Mr. Huey identified a disc containing a recording of a call made by Mr. Copelin on September 11, 2012, and a call data sheet from the call. The recording was played for the jury.

Debra Adams, a 911 operator, identified an audio CD of the 911 calls resulting from the robbery that occurred at the Homedale Inn. It was played for the jury.

*Harmless error analysis*

As noted earlier, the erroneous admission of other crimes evidence is subject to a harmless error analysis. In this case, the jury was entitled to hear about Mr. Copelin's prior offense—the 2003 armed robbery—in conjunction with the felon in possession of a firearm charge.[39]  For this purpose, however, the jury was only entitled to hear the fact that Mr. Copelin was convicted of the prior offense. Stated otherwise, the joint trial of the two offenses—armed robbery and possession of a firearm by a felon—did not open the door to the State introducing in depth testimony regarding the facts of the 2002 burglary. The question here is thus whether the State's introduction of the details of the 2002 bank robbery was harmless error.

Mr. Copelin contends the introduction of the other crimes evidence was not harmless error. In support, he argues that his conviction turned largely on Ms. Howard's credibility. Continuing, he contends that if the jury decided that Ms. Howard's testimony was not credible "given her self-interested incentive to testify favorably for the State," the State could not convict him without considering his prior conviction. The evidence presented at trial belies this contention.

Both victims—Ms. Gostl and Mr. Putfark—testified that the Mr. Copelin's physical characteristics—his height, build, skin tone, eyes, and voice—exactly matched the unique physical characteristics of the robber. During Mr. Copelin's cross examination of them, acting as his own counsel, both victims all but positively identified Mr. Copelin at trial. Ms. Gostl described the robber

---

[39]  *See State v. Batiste*, 96–2203, p. 5 (La. App. 4 Cir. 10/22/97), 701 So.2d 729, 732 (holding that "the defendant's status as a convicted felon is an element of the crime of possession of a handgun by a convicted felon. As such, prior convictions should not and cannot be excluded under the *Prieur* doctrine or the State would never be able to successfully prosecute this offense."); *State v. Blueford*, 48,823, pp. 13–14 (La. App. 2 Cir. 3/5/14), 137 So.3d 54, 62, *writ denied*, 14–0745 (La. 11/21/14), 160 So.3d 968, *cert. denied*, ––– U.S. –––– , 135 S.Ct. 1900, 191 L.Ed.2d 770 (2015).

as very tall, approximately six-three; very fit, thin, athletic build; and having a very dark complexion. She added that the robber wore a long-sleeved black shirt, black pants, and latex gloves underneath a pair of black gloves. On cross-examination, Mr. Copelin—acting as his own counsel—asked Ms. Gostl who robbed the Homedale Inn. She replied: "[i]t was a man that was your height, your build, your complexion, and had very similar eyes." Ms. Gostl, however, indicated that she could not say anything more because the robber wore a mask. Ms. Gostl, however, was able to see the robber's skin tone because neither the robber's neck nor his wrists were covered.

Mr. Putfark similarly testified that the robber was wearing a black long sleeved shirt, black pants, and a wool knit cap with eye holes cut out pulled over his head. During cross examination by Mr. Copelin, Mr. Putfark acknowledged that he did not know who robbed the Homedale Inn and that it could have been anyone. On redirect, however, the following exchange occurred:

> Q. Mr. Putfark, the defendant asked you if anyone could have robbed the Homedale Inn and you answered the question. Could the person that robbed the Homedale Inn have been white?
>
> A. No.
>
> Q. Could he have been fat?
>
> A. No
>
> Q. Could he have been short?
>
> A. No.
>
> Q. Could he have had a high-pitched voice?
>
> A. No.
>
> Q. Could the person that robbed Homedale Inn, is he the same height as Darrius Copelin?
>
> A. Yes.
>
> Q. Does he have the same voice as Darrius Copelin?
>
> A. Yes.
>
> Q. Is he the same build as Darrius Copelin?

A. Yes.

Likewise, Ms. Adams, the 911 operator, read the description of the perpetrator that was noted in connection with the 911 calls, which was as follows: "[b]lack male, tall, thin built, wearing knit cap/ski mask, black clothing, white surgical gloves, armed with black semi-automatic gun and carrying a back [sic] backpack. Subject ran on Hawthorne toward Florida."

Moreover, the unexplained presence of the vehicle containing Mr. Copelin's wallet, identification cards, cell phone, and watch along the path of his flight created an overwhelming combination of direct and circumstantial evidence against him. Mr. Copelin failed to present any evidence that might have led the jury to find merit in his claim that someone else stole the vehicle and committed the robbery.[40]  There is nothing to suggest that the evidence of Mr. Copelin's prior offense would have led the jury to abandon its role as fact-finder and conclude that Ms. Howard's testimony was credible when it was not. Moreover, the formal statement Ms. Howard provided to the police when she and Mr. Copelin were initially detained supports her credibility. In her initial statement, she informed the police that Mr. Copelin committed the robbery of the bar, that she picked him up from the vicinity of the bar, and that she saw him in possession of a gun.

Considering the strength of the evidence the State presented at trial against Mr. Copelin, we cannot conclude the jury verdict was attributable to the error of admitting the other crimes evidence. We thus conclude that the erroneous admission of the other crimes evidence was harmless error. This assignment is without merit.[41]

The Louisiana Supreme Court denied relief without additional stated reasons.

---

[40]  Mr. Copelin, who represented himself at trial, submitted an opening statement on his behalf. He told the jury that on the night of the burglary, he had possession of his girlfriend's car and traveled to a gentleman's club in New Orleans East. He had a sexual encounter in the car with a dancer from the club, and he placed his wallet and cell phone in the center console of the car. After returning to the club, he realized that his wallet and his keys were missing. When he went outside, he discovered that the car was missing. Mr. Copelin suggested that whoever stole the car committed the robbery and that the State's case against him was predicated on mistaken identity.

[41]  *State v. Copelin*, 206 So.3d at 1000-1012 (footnotes in original).

Here, Copelin challenges the state-court determination under state law that even though the trial court erroneously admitted the 2002 bank robbery details under Louisiana Code of Evidence article 404(B), it was harmless error under Louisiana Code of Criminal Procedure article 921.    As the State correctly argues, this purely state-law claim asserted by Copelin is not cognizable on federal habeas review.    A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law." *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (quotation omitted); *see also Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (federal habeas review does not lie for errors of state law); *accord Molo v. Johnson*, 207 F.3d 773, 776 n. 9 (5th Cir. 2000); *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996)); *see also Hogue v. Johnson*, 131 F.3d 466, 506 (5th Cir. 1997) (a disagreement as to state law is not cognizable on federal habeas review).    Federal habeas review is limited to errors of constitutional dimension; thus, federal courts do not review the mere admissibility of evidence under state law.    *Estelle*, 502 U.S. at 67-68; *Gonzales v. Thaler*, 643 F.3d 425, 429 (5th Cir. 2011); *Castillo v. Johnson*, 141 F.3d 218, 222 (5th Cir. 1998).    A federal habeas court's review extends only to violations of constitutional magnitude such as due process violations that render the criminal proceedings fundamentally unfair.    *Lisenba v. California*, 314 U.S. 219, 236-37 (1941); *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991) (Habeas corpus review is proper only to determine whether a state trial judge's error is so extreme as "to render the trial fundamentally unfair or violate an explicit constitutional right.").

A thorough review of the record confirms that Copelin did not raise a federal due

process claim in the state courts on direct appeal.     His assigned and briefed appellate error addressed only state evidentiary law.[42]     The state-court determination therefore was based solely on the application and analysis of trial error under state law evidence rules. Copelin did not reassert the claim in any context in his application for post-conviction relief; it was not raised at all during post-conviction proceedings.     Thus, no federal due process claim was ever presented to or considered by the state courts.     Moreover, in this federal application, Copelin does not assert a federal due process claim based on the alleged improper admission of "other crimes" evidence.     Under these circumstances, the Court will not liberally construe the instant claim as one asserting a violation of federal due process and essentially consider a claim on his behalf that he has never raised in any court.     Even if there were some compelling reason to recharacterize the claim as one asserting a violation of federal due process, that federal claim would be unexhausted and technically procedurally defaulted and not subject to review, in any event.[43]     *See*, *e.g.*, *Norris v. Davis*, 826 F.3d 821, 831 (5th Cir. 2016); *Gonzales v. Thaler*, 643 F.3d 425, 429-30 (5th Cir. 2011); *Spratt v. Vannoy*, Civ. Action 19-9115, 2019 WL 7593274, at *7 (E.D. La Oct. 30, 2019), *report and recommendation adopted*, 2020 WL 242785 (E.D. La. Jan. 16, 2020).     Copelin would have a rigorous burden to overcome those substantial bars to obtain federal habeas review of any

---

[42]   State Rec., Vol. 2 of 6, Appellant Brief, p. 16.

[43]   Copelin would no longer be able to obtain post-conviction review of the claim in the state courts because the claim likely would be considered successive/repetitive and/or untimely, and thus procedurally barred under state procedural rules.     La. C.Cr.P. arts. 930.4, 930.8. *See State v. Copelin*, 2018-1008 (La. 2019), 282 So.3d 221 (expressly noting the full and final litigation of Copelin's post-conviction relief claims and narrow exceptions to overcome procedural bars to further review).

federal due process claim on the merits.    For these reasons, Copelin is not entitled to relief on this claim.

### C. Cross-Examination and Confrontation/Suppression of Evidence

Copelin claims that his right to confront and cross-examine Officer Kevin Wheeler was improperly restricted because the State prosecutor withheld and misrepresented information about Officer Wheeler's termination from the New Orleans Police Department. He argues that he should have been allowed to use the evidence to impeach Officer Wheeler's credibility.

Before trial, the State filed a motion in limine to restrict Copelin from cross-examining Officer Wheeler about his termination from the police department.    The motion set forth that the prosecution anticipated questioning by the defense about particular acts for which Officer Wheeler had not been convicted (*i.e.*, his dismissal from the police department for alleged untruthfulness), in violation of Louisiana Code of Evidence articles 608 and 609.1, and further alleged that Officer Wheeler had been cleared of any wrongdoing.    The State alleged specifically that the Civil Service Commission, at their last meeting, ruled in favor of Kevin Wheeler.[44]

On August 31, 2015, a hearing was held on several pretrial motions, including the motion in limine.[45]    According to the State, since the time of Copelin's first trial, at which

---

[44]    State Rec., Vol. 2 of 6, Motion in limine to exclude questions and extrinsic evidence pertaining to witnesses' particular acts, vices, or courses of conduct which have not resulted in criminal convictions.

[45]    State Rec., Vol. 4 of 6, Pretrial Hearing Transcript, August 31, 2015.

point Officer Wheeler had been terminated from the police department, the State had spoken to Officer Wheeler's counsel who assured him that they had received a favorable ruling that cleared Wheeler of any wrongdoing and were simply awaiting a written decision from the Civil Service Commission.    The defense objected because it was only an allegation with no written documentation to disprove the documents in the defense's possession that confirmed Wheeler's termination in 2012. [46]    The trial court took the motion under advisement.    On the first day of trial, the trial court granted the State's motion in limine. The trial court ordered the State, if Copelin was convicted, "to supplement the record post-conviction with written proof of what has already been conveyed to you by counsel for Officer Wheeler." [47]    Subsequently, the State supplemented the record to provide the written Civil Service Commission's ruling dated November 30, 2015. [48]    Instead of confirming the State's assertion, however, that ruling contradicted what the prosecutor had told the trial court and showed that the Commission had affirmed Kevin Wheeler's termination for violating the police department's rules relating to honesty and truthfulness and false or inaccurate reports.[49]

---

[46]  *Id.* at pp. 5-8.

[47]  State Rec., Vol. 4 of 6, Trial Transcript (Sept. 1, 2015), pp. 10-11.

[48]  State Rec., Vol. 3 of 6, Notice of Compliance with Court Order; State Rec., Vol. 3 of 6, Minute Entry, 1/19/2016; and State Rec., Vol. 2 of 6, Civil Service Commission's Written Ruling, 11/30/2015, rejecting Officer Wheeler's appeal and affirming his termination.

[49]  Officer Wheeler and another officer were terminated from the NOPD after using a taser in violation of protocol and writing a report that misrepresented the circumstances surrounding its use.

Copelin raised the claim in his post-conviction relief application.    The state courts denied relief.    The district court denied the claim because the line of cross-examination into disciplinary proceedings that involved a particular act or course of conduct by Officer Wheeler was impermissible under the code of evidence and would not have been allowed regardless.[50]    The appellate court and Louisiana Supreme Court denied relief stating only that he did not satisfy his post-conviction burden of proof.[51]    Copelin contends he was denied the right to cross-examine Officer Wheeler about the termination and impeach his credibility with evidence that he had a propensity to fabricate police reports.    Specifically, Copelin argues that he could have shown that Officer Wheeler also lied about the location of Copelin's personal items found in the vehicle parked near the bar, in effect, bolstering his own account that the person who stole the car from him and "trashed" it likely committed the robbery, thereby establishing his defense of mistaken identity.[52]

The United States Fifth Circuit has set forth the controlling federal law regarding confrontation clause analysis in the context of limitations on cross-examination:

> The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI; *see Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). However, "[t]he district court has 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-

---

[50]   State Rec., Vol. 1 of 6, District Court Judgment denying post-conviction relief.

[51]   State Rec., Vol. 5 of 6, *State v. Copelin*, 2018 K-0299 (La. App. 4 Cir. May 14, 2018); *State v. Copelin*, 2018-KH-1008 (La. 2019), 282 So.3d 221.

[52]   Rec. Doc. 11, p. 29.

examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " *United States v. Skelton*, 514 F.3d 433, 439 (5th Cir. 2008) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). "The Confrontation Clause ... is satisfied where defense counsel has been 'permitted to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.' " *United States v. Restivo*, 8 F.3d 274, 278 (5th Cir. 1993) (quoting *Davis*, 415 U.S. at 318, 94 S.Ct. 1105). To establish a Confrontation Clause violation, "the defendant need only show that 'a reasonable jury might have received a significantly different impression of the witness's credibility had defense counsel been permitted to pursue his proposed line of cross-examination.' " *Templeton*, 624 F.3d at 223 (quoting *Skelton*, 514 F.3d at 439).

*United States v. Gentry*, 941 F.3d 767, 781 (5th Cir. 2019).    However, even if cross-examination was improperly curtailed in violation of the Confrontation Clause, a petitioner is not entitled to relief if the error was ultimately harmless.    *Van Arsdall*, 475 U.S. at 680-84.    As the Supreme Court explained regarding harmless-error analysis:

The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. Cf. *Harrington*, 395 U.S., at 254, 89 S.Ct., at 1728; *Schneble v. Florida*, 405 U.S., at 432, 92 S.Ct., at 1059.

*Id*. at 684.    Thus, in order to warrant habeas relief, the constitutional error must also have "had substantial and injurious effect or influence in determining the jury's verdict" and resulted in "actual prejudice."    *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal citation and quotation marks omitted).

Copelin raised the claim in his application for post-conviction relief and the state

courts adjudicated the claim on the merits.[53]    As a result, this Court must determine whether the state-court determination rejecting the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as established by the United States Supreme Court.    *Hatfield v. Vannoy*, Civ. Action 16-10933, 2019 WL 4601556, at *5 (E.D. La. Sept. 23, 2019).

Copelin contends that he should have been allowed "to disclose to the jury that Deputy Wheeler had been dismissed from the NOPD for filing a false police report to hide his prior misconduct."[54]    Here, it is undisputed that Copelin had no opportunity to explore Officer Wheeler's termination from the New Orleans Police Department for violating rules regarding honesty and truthfulness and false or inaccurate reporting.    The restriction on cross-examination and exclusion of impeachment evidence presumably was based at least in part on inaccurate information provided by the State that Officer Wheeler had been cleared of any wrongdoing in that matter.

As an initial matter, to the extent Copelin may challenge the propriety of the trial court's ruling on the State's motion in limine under Louisiana evidence rules or law, that claim is not cognizable on federal habeas review.    As observed earlier, a federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law."    *Wilkerson v. Whitley*, 16 F.3d at 67 (quotation omitted); *see also*

---

[53]   *See Harrington v. Richter*, 562 U.S. 86, 98 (2011) ("By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2). There is no text in the statute requiring a statement of reasons. The statute refers only to a 'decision,' which resulted from an 'adjudication.' ").

[54]   Rec. Doc. 11, p. 32.

*Swarthout*, 562 U.S. at 219 (federal habeas review does not lie for errors of state law). Federal habeas review is limited to errors of constitutional dimension; thus, federal courts do not sit to review the mere admissibility of evidence under state law.    *Estelle*, 502 U.S. at 67-68; *Gonzales*, 643 F.3d at 429.

Furthermore, even assuming, *arguendo*, that the restriction on cross-examination violated the Confrontation Clause, the error in this case was harmless.    Copelin alleges that his inability to impeach Officer Wheeler's credibility undermined Copelin's version of events that his girlfriend's car was stolen from him that night with his valuables inside it, and whoever stole the car and abandoned it near the bar committed the robbery.    He claims that Officer Wheeler offered important testimony about the exact placement of the items in the unlocked car—factors that might suggest the vehicle was "ransacked" and support Copelin's account.    Essentially, Copelin argues that he could not fully impeach Officer Wheeler's credibility even though he testified he was mistaken in his police report and prior testimony when he stated he found Copelin's Medicaid card on the passenger seat, rather than inside the wallet, and that "the car was well kept … it wasn't ransacked or anything like that."[55]    Copelin argues that the error was not harmless for the following reasons:

> Pet. Copelin avers that (1) Dep. Wheeler was the officer who came upon the petitioner's vehicle, confiscated his personal property which, ultimately, directed the State to bring charges against him. Also, Dep. Wheeler's coerced and fabricated testimony at Pet. Copelin's second trial, barred the defense about the peculiar location of the property inside the vehicle. This goes to the importance of the witness testimony in the prosecution's case. (2) Dep. Wheeler was the only testifying witness who actually observed the interior of

---

[55]    State Rec., Vol. 4 of 7, Trial Transcript (Sept. 2, 2015), p. 16. The transcript from Copelin's first trial with Officer Wheeler's alleged testimony was not made a part of the state court record in this case.

the vehicle which demonstrates that his testimony was not cumulative. (3) Dep. Wheeler's own police report (see: Ex. C "Police Report") and first trial testimony contradicted what he testified to at the second trial. (4) the trial court excluded any testimony that would prove Dep. Wheeler had a history of filing false police reports, as he had done in the instant case. This illustrates that Pet. Copelin's cross-examination was limited on material facts. And (5) the overall strength of the prosecution's case was not overwhelming, where, besides Dep. Wheeler, Aisha Howard, who was a convicted felon, was forced to testify favorably for the State to overcome a possible perjury prosecution. The 10-2 conviction of Pet. Copelin in this matter is an attestation to the non-compelling evidence presented by the State.[56]

The State argues that Officer Wheeler's testimony was not central to the State's case, and that Copelin's petition overstates the importance of his testimony.    The State asserts that unlike Aisha Howard, whose testimony "connected the dots, linking Copelin, the Nissan Maxima found on Hawthorne Street, and the armed robbery of the Homedale Inn," Officer Wheeler was not a key witness in the prosecution's case.    The record supports this contention.

Although Copelin argues that the restriction on impeachment was not harmless, the record shows otherwise.    Officer Wheeler's testimony was summarized by the Louisiana Fourth Circuit on direct appeal as follows:

> Deputy Kevin Wheeler was the first officer to arrive on the scene. He testified that on September 9, 2012, he was an NOPD officer working the Lakeview Crime Prevention assignment when he received a call over his police radio that the Homedale Inn had been robbed. At that time, he was only about three quarters of a mile from the Homedale Inn, which was located on Homedale Street. He arrived at the bar in less than a minute after receiving the call. When he turned the corner onto Homedale Street, he saw a number of patrons yelling and pointing. He exited his car for a second. The patrons told him that the robber "went that way, he ran that way," and they pointed towards Hawthorne Street. Deputy Wheeler returned to his car, drove down Homedale Street, and turned onto Hawthorne Street. The first thing he noticed after

---

[56]  Rec. Doc. 11, p. 33.

making the turn was a vehicle parked on the right side of the street.

According to Deputy Wheeler, the vehicle was parked away from the curb and thus impeding traffic. The vehicle had a temporary license plate in the window, the driver's seat was fully reclined, and the keys were on the dash. The manner in which the vehicle was parked, the temporary license plate, coupled with and the manner in which the keys were left on the dash caused Deputy Wheeler to be suspicious of its presence so close to the scene of the robbery. Deputy Wheeler canvassed the area and knocked on doors in the neighborhood to see if the vehicle belonged to anyone who lived in the area. None of the residents owned or were familiar with the vehicle. Deputy Wheeler touched the hood of the vehicle and felt that it was "more than warm"; the vehicle thus had just been parked there. At this point, Deputy Wheeler elected to have the vehicle towed because it was impeding traffic.

Before the vehicle was towed, Deputy Wheeler performed an inventory search. In the center console, he discovered a wallet containing Mr. Copelin's driver's license and other identification. He also located a watch and a cell phone inside a black case on the passenger seat. The vehicle was then towed and impounded. According to Officer Wheeler, if he had not been dispatched to the armed robbery and arrived at the scene in less than a minute, Mr. Copelin would have used the vehicle to escape.

While Officer Wheeler was the initial officer to respond to the robbery call and found the vehicle near the bar that raised suspicion, he was not the sole responding officer. Officer Harris, the detective assigned to investigate the robbery, arrived at the scene shortly after Officer Wheeler.    He relocated to Hawthorne Street where he too observed the vehicle parked strangely and inspected the interior of the vehicle and saw the personal items, which were ultimately inventoried when the car was towed for being parked illegally.    Copelin was able to question Detective Harris on cross-examination about the items he saw in the vehicle that were eventually inventoried by Officer Wheeler.[57]    The discovery of the vehicle itself containing Copelin's personal items was important to the investigation since that car

---

[57]  State Rec., Vol. 4 of 6, Trial Transcript (Sept. 2, 2015), p. 48.

was reported stolen soon after the robbery, as Harris testified, but the exact location of the personal items found inside the vehicle was not material to the State's case.    As demonstrated in closing argument, the State only briefly remarked in rebuttal that it made no sense for a car thief to leave valuables like money, a cell phone and a watch in the vehicle.[58] The focus of the State's case, discussed in closing argument, was how the evidence offered by Aisha Howard, and recorded jail calls made by Copelin himself, directly contradicted Copelin's account that the car was stolen while he was at a strip club.

Copelin was otherwise permitted extensive cross-examination of Officer Wheeler. Copelin was able to explore at length why his testimony about the Medicaid card differed from his prior testimony and police report.[59]    He was able to question Officer Wheeler's testimony regarding why the car aroused his suspicion to the extent he stopped searching for a perpetrator and focused on the vehicle.    And he was able to question Officer Wheeler thoroughly about the car being illegally parked as the reason for towing and impounding the vehicle, all of which was corroborated by Detective Harris.    No significantly different impression of his testimony would have resulted had Copelin pursued the line of questioning about his termination arising from a distinct, isolated incident unrelated to this case.

The record contradicts Copelin's assertion that if Officer Wheeler was discredited with the additional impeachment evidence then the fact that the Medicaid card was on the passenger seat would have proven the vehicle was stolen and ransacked by a car thief who

---

[58]    *Id.* at 195-96.

[59]    *Id.* at 14 (Cross-Examination of Officer Kevin Wheeler).

then robbed the bar and abandoned the vehicle.    To the contrary, given that the key witness, Aisha Howard, explained candidly how and why she and Copelin fabricated the story to report the vehicle stolen and linked Copelin directly to the robbery, and the strength of the State's case based on her testimony, corroborated in part by Akein Spots, and that of the bartender and bar owner as to the similarities between Copelin and the perpetrator, the restriction on impeachment here did not have a substantial and injurious effect or influence in determining the jury's verdict and result in actual prejudice.    For this reason, the constitutional error, if any, was harmless beyond a reasonable doubt.    The state court's denial of relief on this claim was not unreasonable.    Copelin is not entitled to habeas relief on this claim.

Citing *Brady v. Maryland*, 373 U.S. 83 (1963) and *United States v. Bagley*, 473 U.S. 667 (1985), Copelin argues that the State misrepresented evidence during the pretrial motion hearing regarding the status of Officer Wheeler's termination and effectively withheld material impeachment evidence in violation of his constitutional rights.[60]    The claim was raised together with his confrontation claim and rejected by the state courts on post-conviction review because he did not satisfy his burden of proof.

"The *Brady* rule requires the State to 'disclose evidence favorable to the accused that,

---

[60]    The record supports the State's assertion that the claim was exhausted in the state courts and denied on the merits. Copelin's barebones PCR application in the state district court contained little argument in support of his grounds for relief; however, his subsequent writ applications appear to advance a claim that material impeachment evidence was suppressed. State Rec., Vol. 2 of 6, PCR Application; State Rec., Vol. 5 of 6, Writ No. 2018-K-299, p. 4; State Rec., Vol. 6 of 6, No. 18-KH-1008, p. 15. The appellate courts reasoned only that he did not sustain his burden of proof on post-conviction relief.

if suppressed, would deprive the defendant of a fair trial.' "    *DiLosa v. Cain*, 279 F.3d 259, 262-63 (5th Cir. 2002) (quoting *United States v. Bagley*, 473 U.S. at 675).    To establish a *Brady* violation, the defendant must show that (1) the state withheld evidence, (2) the evidence is favorable to the accused, and (3) the evidence is material to guilt or punishment. *Id.* (citing *Bagley*, 473 U.S. at 674, 105 S.Ct. 3375).    This duty extends to both exculpatory and impeachment evidence.    *Id.* (citing *Bagley*, 473 U.S. at 676).    Suppression by the prosecution of evidence favorable to the defendant upon request violates due process, where the evidence is material to either guilt or punishment of the defendant, irrespective of the good or bad faith of the prosecution.    *Brady*, 373 U.S. at 87.

Evidence is material where there exists a "reasonable probability" that had it been disclosed the result at trial would have been different.    *Banks v. Dretke*, 540 U.S. 668, 699 (2004) (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).    "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."    *Bagley*, 473 U.S. at 682. *Brady* claims present a mixed question of law and fact.    *Trevino v. Johnson*, 168 F.3d 173, 184 (5th Cir. 1999).    Therefore, this Court must defer to the state court's decision rejecting the *Brady* claim unless the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Although Copelin alleges that the State had access to the Commission's written judgment on some earlier date, the judgment was not rendered until well after trial, on November 30, 2015.    Before that time, as the State represented at the August 31, 2015 pretrial hearing, the State spoke to Officer Wheeler's attorney and learned that Officer

Wheeler had received a favorable ruling.    This information was incorrect.    No such ruling ever existed.    Indeed, no ruling at all had been issued at that time.    It was the inaccurate information relayed by the State to the trial court at the pretrial hearing that influenced the court's decision not to allow Copelin to use the 2012 termination of Officer Wheeler, which Copelin possessed, as potential impeachment evidence at trial.    No misrepresentation was made at trial.

To the extent Copelin may argue that the trial court ruled incorrectly on the motion in limine because the information obtained and relayed by the State in support of the pretrial motion could not be confirmed, that claim is not cognizable on federal habeas review. Whether the trial court's ruling excluding the evidence about his termination (which was apparently still pending on appeal before the Commission) was correct or proper under state law is not before this federal court.    *Estelle*, 502 U.S. at 67-68.    Copelin also fares no better on his federal suppression claim.

The facts arguably do not support a contention that the State suppressed any evidence by not providing Copelin pretrial with the ultimate judgment, which had not yet been rendered and which the State therefore did not (and could not) possess.    The information the State did obtain from counsel for Officer Wheeler was made known to the trial court and the defense, but it was incorrect.    Whether the State misunderstood the information conveyed by Officer Wheeler's counsel or his counsel misconstrued the Civil Service Commission's anticipated ruling is unknown.    However, what is clear is that the actual judgment was not even reduced to writing at the time.    Therefore, the State could not withhold or suppress evidence of a judgment that post-dated these trial proceedings.

Additionally, even assuming, *arguendo*, that the State suppressed impeachment evidence, the State correctly argues that the evidence was not material.    Impeachment evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."    *Bagley*, 473 U.S. at 682.    As previously discussed, Copelin argues that it would have impugned Officer Wheeler's credibility, showed he was lying about the location of one item in the car (his Medicaid card), and strengthened Copelin's defense that his car was stolen and the car thief committed the bar robbery.    However, when viewed in the context of the entire record, there is no reasonable probability that the result of the trial would have been different had the defense possessed the Commission's judgment upholding Officer Wheeler's termination or been able to explore that issue during cross-examination.

As the United States Fifth Circuit Court of Appeals has explained, "[w]e do not consider the suppressed evidence in a vacuum.    Instead, its materiality 'depends almost entirely on the value of the [undisclosed] evidence relative to the other evidence mustered by the [S]tate.' "    *Speer v. Lumpkin*, –––Fed. Appx.––––, 2020 WL 4778227, at *5 (5th Cir. 2020) (quoting *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010) (quotations omitted)). Despite the restriction, Copelin still was able to present his defense by showing that Officer Wheeler's testimony about the Medicaid card admittedly conflicted with his prior testimony and the police report.    Furthermore, the items themselves, which were found in the car and inventoried, corroborated Officer Wheeler's police report, as did the account offered by Detective Harris who was also present that night.    And, as the State correctly notes, its case establishing guilt was built around its key witness, Aisha Howard, and the jury crediting her

version of the events, not Officer Wheeler's relatively minor investigative role that entailed impounding the vehicle.    Thus, Copelin has not shown that the evidence was material under *Brady*.    Copelin has not established that the state courts' decision denying this claim was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

 *D. Fourth Amendment Search and Seizure*

  Finally, Copelin asserts that the trial court erroneously admitted evidence seized during an unlawful warrantless inventory search of the vehicle in violation of the Fourth Amendment.    As part of pretrial proceedings during his first trial, Copelin filed a motion to suppress, which was denied following a hearing on the motion.    The Louisiana Fourth Circuit subsequently denied his supervisory writ application noting that he would have an opportunity to raise the issue on appeal.[61]    Copelin did not file a motion to suppress during the second trial.    He raised the issue post-trial, first in a motion for new trial, and then in post-conviction relief proceedings following his conviction.    The state courts denied post-conviction relief because he did not satisfy his burden of proof.    The State correctly asserts that he is not entitled to federal habeas review of this Fourth Amendment claim under *Stone v. Powell*, 428 U.S. 465 (1976).

  In *Stone*, the United States Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an

---

[61]  State Rec., Vol. 5 of 6, *State v. Copelin*, 2013-K-1625 (La. App. 4th Cir. Dec. 12, 2013).

unconstitutional search and seizure was introduced at trial."    *Id.* at 494 (footnote omitted); *see also Janecka v. Cockrell*, 301 F.3d 316, 320 (5th Cir. 2002).    The United States Court of Appeals for the Fifth Circuit has further interpreted an "opportunity for full and fair litigation" to mean just that, "an opportunity."    *Caver v. Alabama*, 577 F.2d 1188, 1192 (5th Cir. 1978); *Janecka*, 301 F.3d at 320.    "If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, *Stone* bars federal habeas corpus consideration of that claim...."    *Caver*, 577 F.2d at 1192 (citations omitted). And *Stone* "bars federal habeas corpus consideration of the Fourth Amendment claim whether or not the defendant employs those processes."    *Janeka v. Cockrell*, 301 F.3d at 320.    "[I]t is the existence of state processes allowing an opportunity for full and fair litigation of fourth amendment claims, rather than a defendant's use of those processes, that serves the policies underlying the exclusionary rule and bars federal habeas corpus consideration of claims under *Stone v. Powell*."    *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1980).    The United States Fifth Circuit has also held that the *Stone* bar applies despite an error by the state court on procedural grounds or the merits of the Fourth Amendment claim.    *Swicegood v. Alabama*, 577 F.2d 1322, 1324–25 (5th Cir. 1978).

Copelin has not alleged, much less shown, that the state-court process or proceeding afforded him was inadequate.    *Williams*, 609 F.2d at 220.    He had a full and fair opportunity to litigate his Fourth Amendment claim in the state courts.    *See Register v. Thaler*, 681 F.3d 623, 628 (5th Cir. 2012); *Peek v. Tanner*, Civ. Action 18-0604, 2018 WL 8519738, at *4 (E.D. La. July 26, 2018), *report and recommendation adopted*, 2019 WL 2423230 (June 10, 2019).    He certainly had the ability to file a pretrial motion to suppress

at his second trial.     And even though he chose not to refile the motion, he was afforded review on the motion to suppress as part of his post-conviction proceedings.     Accordingly, *Stone* bars review of this claim.     For this reason, the claim for federal habeas relief should be denied.

**RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that Copelin's application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[62]

New Orleans, Louisiana, this __9th__ day of __December__ 2020.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[62] *Douglass* referenced the previously applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to 14 days.