UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DARRIUS R. COPELIN                              CIVIL ACTION

VERSUS                                          NO. 18-10970

DARRYL VANNOY                                   SECTION "R" (5)

## ORDER AND REASONS

Before the Court are petitioner Darrius R. Copelin's objections[1] to the
Magistrate Judge's Report and Recommendation ("R&R")[2] denying his
application for a writ of habeas corpus.   Having reviewed the parties'
briefing, the Magistrate Judge's R&R, the parties' objections to the R&R, and
the responses to the objections, the Court approves the R&R and adopts it as
its opinion, with the following additional discussion.

## I.    BACKGROUND

Darrius Copelin was charged by a bill of information with one count of
armed robbery with a firearm, and one count of possession of a firearm by a
convicted felon.  *State v. Copelin*, 206 So. 3d 990, 993 (La. App. 4 Cir. 2016).

---

[1]    R. Doc. 27 (Petitioner's Objections to the Magistrate's Report and
Recommendation); R. Doc. 49 (Petitioner's Reply).
[2]    R. Doc. 26.

Both charges arise out of an armed robbery that occurred on September 9, 2012, at a neighborhood bar called the Homedale Inn. *Id.* at 994. Copelin's first trial began in July of 2014, but it ultimately ended in a mistrial after Judge Karen Herman determined that the jury was deadlocked. *Id.* On October 22, 2014, the State reinstituted the charges against Copelin.[3] At his second trial, Copelin was convicted by a jury on both counts. *Id.* He was sentenced to 125 years' imprisonment with no possibility of probation, parole, or suspension. *Id.* at 993-94. At both trials, Copelin represented himself *pro se* with "the advice at trial of an attorney from the Orleans Public Defender[s]—a form of hybrid representation." *Id.* at 993.

Copelin now petitions this Court for a writ of habeas corpus under 28 U.S.C. § 2254.[4] He raises four grounds for relief: (1) he was subject to double jeopardy after the court declared a mistrial in his first trial;[5] (2) the trial court erred in admitting "other crimes" evidence;[6] (3) the court improperly limited his cross-examination of a witness because the State withheld material impeachment evidence;[7] and (4) the evidence from an unlawful search and

---

[3]    State Rec., Vol. 1, Bill of Information, Orleans Parish.

[4]    R. Doc. 1.

[5]    *Id.* at 6.

[6]    *Id.* at 8.

[7]    *Id.* at 9.

seizure should have been suppressed under the Fourth Amendment.[8] Copelin raised his first two claims on direct appeal. The Louisiana Fourth Circuit and the Louisiana Supreme Court ultimately affirmed his conviction. *Copelin*, 206 So. 3d 990; *State v. Copelin*, 227 So. 3d 286 (La. 2017). He raised his third and fourth claims for the first time in his state post-conviction relief application, and was denied relief by the Louisiana Supreme Court. *State v. Copelin*, 282 So. 3d 221 (La. 2019) (per curiam). The State filed a response to Copelin's habeas petition on August 28, 2020, contending that although petitioner's claims have met the procedural requirements of timeliness and exhaustion, he is not entitled to habeas relief on the merits.[9]

Pursuant to 28 U.S.C. § 636(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing § 2254 Cases, the Court referred the matter to Magistrate Judge Michael North. After considering petitioner's allegations, Magistrate Judge North issued an R&R recommending that Copelin's petition be denied and dismissed with prejudice.[10] Petitioner timely filed objections to the R&R.[11] He objected to the following findings in the R&R: (1) that he waived his double-jeopardy claim in state court;[12] (2) that there

---

[8]   *Id.* at 11.
[9]   R. Doc. 25.
[10]   R. Doc. 26.
[11]   R. Doc. 27.
[12]   *Id.* at 1-5.

were no Confrontation Clause or *Brady* violations;[13] and (3) that he was not entitled to federal habeas review of his Fourth Amendment claim.[14]

The Court addresses each objection in turn.

## II.   LEGAL STANDARD

The Court applies *de novo* review to the parts of the R&R to which the parties objected.  Fed. R. Civ. P. 72(b)(3).  The Court is limited to plain-error review of any part of the R&R not subject to a proper objection.  *Starns v. Andrews*, 524 F.3d 612, 617 (5th Cir. 2008).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") defines "[t]he statutory authority of federal courts to issue habeas corpus relief for persons in state custody." *Premo v. Moore*, 562 U.S. 115, 120 (2011). Under AEDPA, a federal habeas court may not grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court, unless the state court adjudication resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of

---

[13]    *Id.* at 6-7.
[14]    *Id.* at 8.

the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). A decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000). "A state court decision involves an unreasonable application of federal law if it 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" *Cobb v. Thaler*, 682 F.3d 364, 373 (5th Cir. 2012) (quoting *Williams*, 529 U.S. at 407-08). This demanding standard is "met only 'in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings' . . . and 'demands that state-court decisions be given the benefit of the doubt." (internal citations omitted)). The state court's findings of fact are entitled to a presumption of correctness, and they can be rebutted only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

## III.  DISCUSSION

### A.  *Brady* Claim

Copelin alleges that at his second trial the State withheld material impeachment evidence about one of its witnesses, Officer Kevin Wheeler, regarding Wheeler's termination from the New Orleans Police Department. Wheeler was terminated from the New Orleans Police Department on November 27, 2012 for violating the Department's rules related to "Honesty and Truthfulness," and "False or Inaccurate Reports."[15]  The State provided the defense with Wheeler's termination letter before the first trial.[16]

At petitioner's first trial in July of 2014, the State called Wheeler to testify about his investigation of a car parked near the scene of the robbery. Wheeler was the first officer to arrive at the scene of the robbery.[17]  He testified that, after arriving on the scene, patrons told him the robber "ran that way," and pointed toward Hawthorne Street.[18]  Wheeler turned onto

---

[15]   R. Doc. 49-3 at 1 (Written Judgment from the City of New Orleans Civil Service Commission in *Wheeler v. Department of Police*).  Wheeler was additionally suspended for unauthorized force, failure to report misconduct, and violation of the instructions on the use of an Electronic Control Device.  *Id.* at 1 & n.1.

[16]   *See* R. Doc. 11-2 at 64:14-20; 67:1-8; 68-30-32 (Wheeler Testimony, Trial #1).

[17]   *Id.* at 56:22-57:1.

[18]   *Id.* at 57:2-6.

Hawthorne Street where he immediately noticed a dark-colored Nissan car parked on the right side of the street.[19]  The car caught his attention because it was parked approximately two feet from the curb and was impeding the flow of traffic.[20]  Wheeler got out of his vehicle and went to inspect the car. He began by touching the hood of the car, which was warm, suggesting the car had recently been driven.[21]  Wheeler next canvassed the neighborhood where the car was found to find the owner of the vehicle.[22]  Wheeler spoke with several people in the neighborhood, but no one knew who owned the vehicle, nor had anyone previously seen the car in the neighborhood.[23]

Wheeler decided to have the vehicle towed because it was impeding the flow of traffic.[24]  He explained that when an officer tows a car, it is New Orleans Police Department policy "to do an inventory of the vehicle for any type of identifiable or valuable property."[25]  Following the department's procedure, Wheeler conducted an inventory search of the interior of the vehicle and found the vehicle's keys on the dashboard, a wallet in the center console containing Copelin's driver's license, bank card, and debit card, and

---

[19]     *Id.* at 57:26-58:9.
[20]     *Id.* at 57:30-32; 73:1-31.
[21]     *Id.* at 73:1-31.
[22]     *Id.* at 59:1-8.
[23]     *Id.* at 59:1-8.
[24]     *Id.* at 59:11-13.
[25]     *Id.* at 59:17-23.

a watch, cell phone, and Medicaid card on the passenger seat.[26]  On cross-examination, Copelin asked Wheeler whether Copelin's "work cards and letters were scattered all over the back seat" of the vehicle.[27]  Wheeler responded that he did not recall seeing either letters or cards scattered on the backseat.[28]  He also noted that he did not remember the vehicle being "unkept," and instead testified that it "appeared to be orderly and nice inside the car."[29]  After Wheeler conducted the inventory search of the car and had the car towed, he logged Copelin's personal belongings as property with the New Orleans Police Department.[30]  Wheeler testified that, at the time, he did not know that the car was registered to the grandmother of Copelin's girlfriend.[31]

The State also asked Wheeler about his employment history, and specifically his dismissal from the police force.[32]  Wheeler testified that he was dismissed after he was "accused of using unauthorized force and being

---

[26]    *Id.* at 59:24-61:24; 78:24-79:8.   Wheeler's testimony about the property he recovered, and where the property was located within the vehicle, is consistent with his inventory report.  R. Doc. 11-1 at 7 (Police Report).

[27]    R. Doc. 11-2 at 79:9-15 (Wheeler Testimony, Trial #1).

[28]    *Id.* at 79:22-23.

[29]    *Id.* at 79:16-18.

[30]    R. Doc. 11-1 at 7 (Police Report).

[31]    R. Doc. 11-2 at 77:27-78:4 (Wheeler Testimony, Trial #1).

[32]    *Id.* at 55:21-56:3.

untruthful about it."[33]  He stated that his dismissal and related misconduct were not "in any way related" to his investigation and testimony at Copelin's trial.[34]  On cross examination, Copelin asked Wheeler about his termination from the New Orleans Police Department, and proceeded to question him about the basis for the termination.[35]  Wheeler said that, although the Department had fired him after an "investigator accused [him] of . . . false and inaccurate reporting," his termination was "currently under appeal with the Civil Service Commission."[36]

The State also called Copelin's girlfriend, Aisha Howard.  Howard had previously given a voluntary statement to the police, informing them that Copelin committed the robbery at the Homedale Inn, that she had to pick him up the following morning because he was without a car, and that when she picked him up, he was wearing all black and had a gun.[37]  At trial, Howard recanted her earlier statement, and testified that Copelin did not tell her he committed the robbery, and that she never saw him with a gun.[38]  The judge

---

[33]  *Id.* at 56:4-6.
[34]  *Id.* at 56:7-9.
[35]  *Id.* at 63:20-32.
[36]  *Id.* at 64:10-13; 69:7-12.
[37]  *Id.* at 10:14-12:15.
[38]  R. Doc. 49 at 2.

ultimately declared Copelin's first trial a mistrial after she determined that the jury was unable to reach a verdict. *Copelin*, 206 So. 3d at 993.

Following the mistrial, the State reinstituted the charges against Copelin.[39]  The State again planned to call Wheeler to testify at Copelin's second trial.[40]  The day before trial, the State filed a motion *in limine* seeking to limit Copelin's questioning of Wheeler about his termination.[41]  The State's motion *in limine* represented that:

> Wheeler has been cleared of any wrongdoing or untruthfulness. The Civil Service Commission, at their last meeting, ruled in favor of Kevin Wheeler and his codefendant Juan Vara.  Because no conviction has arisen from these acts, counsel is prohibited by [Louisiana's] Code of Evidence from questioning the witnesses about such acts, or otherwise mentioning, referring to, or alluding to such acts.[42]

Copelin opposed the motion, arguing that the State was only making an "allegation," and had no paperwork to support its claim that Wheeler was cleared of any wrongdoing.[43]  At a hearing on the State's motion, the prosecutor told Judge Herman, on the record, that the previous evening he had spoken to Wheeler's attorney, Mr. Livaccari, who assured him "that it would be an accurate representation to this Court that a ruling has been

---

[39]    State Rec., Vol. 1, Bill of Information, Orleans Parish.

[40]    R. Doc. 11-4 (Wheeler Testimony, Trial #2).

[41]    R. Doc. 11-1 (Motion *in limine*).

[42]    *Id.* at 2.

[43]    R. Doc. 1-3 at 6:28-7:5 (Pretrial Hearing, Trial #2).

rendered in favor of Kevin Wheeler in this case."[44]  The prosecutor explained that Mr. Livaccari said that, although he was "waiting on the written judgment from the civil service committee," he had learned about the favorable ruling "from the committee via phone call."[45]

The next day, the trial court granted the motion.[46]  In granting the motion, the judge ordered the State to supplement the record "with written proof of what has already been conveyed[] by counsel for Officer Wheeler."[47] On November 30, 2015, almost three months after Copelin's second trial concluded, the City of New Orleans Civil Service Commission released its decision.[48]  The State, in compliance with the court's order to supplement the record, provided a copy of the Commission's decision to the court.[49] Despite the State's representations to the contrary at Copelin's trial, the Commission did not clear Wheeler of wrongdoing, and instead affirmed Wheeler's termination for misconduct and dishonesty.[50]  The Commission concluded that Wheeler had filed a false police report regarding the circumstances surrounding his use of a taser on an unarmed subject in

---

[44]     *Id.* at 7:20-25.
[45]     *Id.* at 7:7-8:2.
[46]     State Rec., Vol. 4, at 10:24-30 (Trial #1).
[47]     *Id.* at 10:29-11:4.
[48]     R. Doc. 11-1 (Notice of Compliance with Court Order).
[49]     *Id.*
[50]     *Id.*

2011.[51]  The Commission determined that the violation merited Wheeler's dismissal from the Department.[52]

In his habeas petition, Copelin asserts that the State withheld material impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, by providing inaccurate information about the status of Wheeler's appeal to the Civil Service Commission.[53]   He argues that *Brady* "required the prosecution to disclose accurately the status of the civil-service proceedings involving Wheeler's termination," and that the State violated this obligation "by falsely representing to the trial court that Wheeler had been cleared of all wrongdoing."[54]  Copelin contends that the information was material because if the "true" status of Wheeler's appeal were disclosed, the trial court would not have granted the State's motion *in limine*.  Accordingly, Copelin would have had the opportunity to "impeach Dep[uty] Wheeler on his dismissal from the NOPD for filing a false police report," and therefore "could have demonstrated to the jury that the deputy was more likely than not to be untruthful about the interior of the vehicle"

---

[51]   R. Doc. 49-3 at 2, 5-8 (Written Judgment from the City of New Orleans Civil Service Commission in *Wheeler v. Department of Police*).

[52]   *Id.* at 9-10.

[53]   R. Doc. 49 at 18-22.

[54]   *Id.* at 20.

where Copelin's personal belongings were found, because Wheeler "already had a history of fabricating police reports."[55]

The Magistrate Judge rejected Copelin's *Brady* claim.  First, he found that "[t]he facts arguably do not support a contention that the State suppressed any evidence by not providing Copelin pretrial with the ultimate [Civil Service Commission] judgment, which had not yet been rendered and which the State did not (and could not) possess."[56]  Magistrate Judge North also found that, even if evidence were suppressed, the suppression was not material.[57]  Petitioner objects to both of these findings.  First, Copelin argues that his claim is not based on the State's failure to disclose a written report that was not yet published, but instead the State's material misrepresentation to the trial court that Wheeler had been cleared of any wrongdoing.[58]  As to materiality, Copelin contends that his inability to cross-examine Wheeler about his termination and prior misconduct "had more than a reasonable likelihood of affecting the outcome in his second trial."[59]

Under *Brady*, "[t]he right to due process is violated where, on request, the government conceals evidence (exculpatory as well as impeachment) that

---

[55]   R. Doc. 11 at 24.
[56]   R. Doc. 26 at 50-51.
[57]   *Id.*
[58]   R. Doc. 49 at 21.
[59]   *Id.* at 19.

is favorable to the defendant and material to guilt or innocence, irrespective of the good faith of the prosecution." *United States v. Webster*, 392 F.3d 787, 797 (5th Cir. 2004) (citing *Brady*, 373 U.S. at 87). *Brady* requires prosecutors to disclose material, favorable evidence "even if no request is made" by the defense. *United States v. Agurs*, 427 U.S. 97, 107 (1976). Further, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

To prevail on his *Brady* claim, Copelin "must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to his guilt or punishment." *Mahler v. Kaylo*, 537 F.3d 494, 500 (5th Cir. 2008). Evidence "favorable to the defense" for purposes of *Brady*'s second prong is not limited to evidence that is exculpatory. Evidence that could be used to impeach a prosecution witness also falls within *Brady*'s disclosure requirement. *See United States v. Bagley*, 473 U.S. 676-77 (1985) ("This Court has rejected any such distinction between impeachment evidence and exculpatory evidence.").

Undisclosed evidence is considered "material" under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682. In

determining materiality, the Supreme Court has explained that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the [undisclosed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434; *see also Wearry v. Cain*, 577 U.S. 385, 392 (2016) ("Evidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972))). Determining materiality under *Brady* is a mixed question of law and fact. *Cobb*, 682 F.3d at 377.

    1. *Failure to disclose*

Copelin must initially show that the State suppressed evidence. *See Harris v. United States*, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998), *aff'd* 216 F.3d 1072 (2d Cir. 2000) ("[I]t is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [him]."). Copelin raises two concerns about the State's failure to disclose information. First, he speculates that, because the State alleged that it had "previously" spoken to Wheeler's attorney, that implied that the State was aware that Wheeler was allegedly cleared of wrongdoing "days or, possibly even weeks, before

deciding to disclose it to the petitioner only one day before his second trial."[60]
The Court finds no merit to petitioner's suggestion that the prosecution
purposefully withheld information that was favorable to the *prosecution*,
until the last minute.  The prosecutor represented at the pretrial hearing that
he spoke with Wheeler's attorney "*last night*," and that during that
conversation, the attorney "informed [the prosecutor] that they received a
favorable ruling" in Wheeler's case.[61]   The record lacks any evidence
supporting Copelin's speculation that the prosecutor misled the court about
the timing of his conversation.  *See In re Coleman*, 344 F. App'x 913, 916 (5th
Cir. 2009) (per curiam) ("[A]n applicant's speculation about the suppression
of evidence is an insufficient basis to support a *Brady* claim.").  Instead, the
record indicates that the prosecutor learned of new information on the eve
of trial, and relayed that information to the court the next day.

Second, Copelin represents that what is "even more egregious is that
the information about Dep. Wheeler's exoneration proved to be totally and
complete[ly] false."[62]   There is nothing in the record to suggest that the
prosecutor did not provide the court with a truthful account of what Mr.
Livaccari conveyed to the prosecutor about the status of Wheeler's appeal.

---

[60]    R. Doc. 11 at 29.
[61]    R. Doc. 1-3 at 7:7-25 (Pretrial Hearing, Trial #2) (emphasis added).
[62]    R. Doc. 11 at 29.

There is also no indication that Mr. Livaccari's representations were in fact untrue at the time he made them. Regardless, Copelin is correct that the information turned out to be false, and that he was prevented, in the meantime, from using the information to impeach Wheeler's credibility at trial. The Court therefore finds that the prosecutor's inaccurate statement about the status of Wheeler's appeal constitutes a failure to disclose information.

The next question is whether the State had a *Brady* obligation to disclose that information. The Magistrate Judge found that the "facts arguably do not support a contention that the State suppressed any evidence by not providing Copelin pretrial with the ultimate judgment, which had not yet been rendered and which the State therefore did not (and could not) possess."[63] Copelin objects to this finding, asserting that it is "irrelevant whether the prosecutors were subjectively aware of the Civil Service Commission's forthcoming ruling," and that, instead, what matters is that "the information was available to other government actors serving on the Commission and was therefore subject to disclosure under *Brady*."[64]

---

[63]     *Id.* at 49-50.
[64]     *Id.* at 20.

In order for Copelin to prove that the information was "suppressed" for *Brady* purposes, he "must also establish that the records were in the prosecutor's possession, known to the prosecutor, or that knowledge of the records should be imputed to the prosecutor, *e.g.*, because the records were known to other members of the prosecution team." *United States v. Meregildo*, 920 F. Supp. 2d 434, 440-41 (S.D.N.Y. 2013). In defining this duty of disclosure, the Fifth Circuit has explained that:

> As *United States v. Agurs* makes clear, *Brady* applies to "information[] known to the prosecution, but unknown to the defense." Yet, "there are limits on the imputation of knowledge from one arm of the Government to prosecutors. The prosecution is deemed to have knowledge of information readily available to it." [It is also] "well-settled that if a member of the prosecution team has knowledge of *Brady* material, such knowledge is imputed to the prosecutors." Exactly who constitutes a member of the prosecution team is done after a "case-by-case analysis of the extent of interaction and cooperation between the two governments."

*United States v. Cutno*, 431 F. App'x 275, 278 (5th Cir. 2011) (per curiam) (internal citations omitted).

Here, it is undisputed that the records of the Commission's ongoing appeal were not in the prosecution's possession. The Court also finds that because the Civil Service Commission was not a member of the prosecution's team, the Commission's knowledge cannot be imputed to the prosecution. *Cf. Metoyer v. Connick*, No. 99-3019, 2000 WL 863133, at *6 (E.D. La. June

18

26, 2000) ("[K]knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for [there is not] an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question."). There is no evidence of "interaction and cooperation" between the prosecution and the Civil Service Commission in Copelin's prosecution. *Cutno*, 431 F. App'x at 278. Without this, the Commission cannot be considered as members of the prosecution team. *See Metoyer*, 2000 WL 863133, at *6 (refusing to impute knowledge to the Government about a witness's misdemeanor convictions because "the Clerk's office of St. James Parish, the jurisdiction in which [the witness] committed his misdemeanor . . . took no part in the prosecution of prosecution of [the defendant] for Miller's murder").

The New Orleans Civil Service Commission is a separate agency, created under the Louisiana Constitution,[65] to oversee the activities of the Civil Service Department, which is responsible for the "overall administration of the personnel function in City government."[66] The Civil Service Commission has the "power to make rules which have the force and

---

[65] La. Const. art. X.

[66] *The Civil Service Commission*, City of New Orleans (Oct. 8, 2021), https://www.nola.gov/civil-service/commission.

effect of law."[67]  It "serves as the court of first instance for all employee appeals resulting from disciplinary actions," and "adopts rules and establishes policies that regulate the conduct of labor and management in the [civil service] merit system."[68]  The Civil Service Commission is not part of a team of prosecutors and police officers investigating crimes, such as the robbery at the Homedale Inn.  Instead, the Commission serves as an independent review body that determines the legitimacy of challenged disciplinary actions taken by the city's various departments, agencies, and commissions.  This independence, and its ability to disagree with the city employers, including the police department, suggest that the Commission was not part of the team that prosecuted Copelin.

Finally, knowledge of the status of Wheeler's appeal can be imputed to the prosecution if that information was "readily available" to it.  Here, the Commission was reportedly in communication with Wheeler's attorney about the status of Wheeler's appeal.  That information should have been available to the police department as a party to the appeal.[69]  The police department also had in its possession video evidence of the challenged

---

[67]  *Id.*

[68]  *Id.*

[69]  R. Doc. 49-3 (Written Judgment from the City of New Orleans Civil Service Commission in *Wheeler v. Department of Police*).

incident involving Wheeler. The video contradicted Wheeler's version of events. In fact, it was this video evidence that the Commission ultimately relied to "establish[] the occurrence of the complained of activity" in Wheeler's appeal.[70] The police department apparently did not seek confirmation from the Commission about the status of Wheeler's appeal. The Court assumes that, had the department made such an inquiry, the available information would have revealed that the Commission had not reached a final decision clearing Wheeler. *See United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) ("That the prosecutor, because of the shortness of time, chose not to run an FBI or NCIC check on the witness, does not change 'known' information into 'unknown' information within the context of the disclosure requirements."). For purposes of Copelin's *Brady* claim, the Court concludes that the fact that there was no final decision clearing Wheeler was "readily available" to the police. The Court further imputes that knowledge to the prosecution, who therefore had a duty to disclose that information. Accordingly, because Copelin has shown that the status of the Commission's deliberations on a pending appeal were "readily available" to the police, he is able to impute that to the State.

---

[70]    *Id.* at 5-10.

2. *Materiality*

But even if the State suppressed such information, the Court concludes that the suppressed evidence was not material.  A nondisclosure of evidence affecting credibility can justify a new trial regardless of the good faith or bad faith of the prosecution. *Giglio*, 405 U.S. at 153-54.  Yet, "when the testimony of a witness who might have been impeached is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence is generally not found to be material." *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996) (quoting *Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994)). Similarly, when the undisclosed evidence is merely cumulative of other evidence, then no *Brady* violation occurs.  *Id.*  Conversely, there is more likely to be a *Brady* violation "when the impeaching evidence 'would seriously undermine the testimony of a key witness on an essential issue or [testimony with] no strong corroboration.'" *Rocha v. Thaler*, 619 F.3d 387, 396-97 (5th Cir. 2010) (citations omitted); *see Strickler v. Greene*, 527 U.S. 263, 292-96 (1999) (holding that even severe impeachment of the only eyewitness to the crime, who "provided the only disinterested, narrative account of what transpired" did not meet *Brady* materiality standards, in light of other evidence that implicated the defendant in the murder).

In his objections, Copelin argues that the suppressed information was material because it would have undermined the credibility of Wheeler, which in turn would have strengthened petitioner's alibi that the car was stolen.[71] In its initial opposition to Copelin's petition, the State was adamant that the information at issue was not material, arguing that Wheeler's testimony was minor and was corroborated by other witnesses.[72]  Since its initial brief, the State—represented by different attorneys—now seeks to distance itself from its earlier position on materiality.[73]  Although the State concedes that the Magistrate Judge's R&R provides a basis for upholding Copelin's conviction and denying his *Brady* claim, it notes that it had moved in state court to exclude Wheeler's testimony, which could undermine any argument that Wheeler's testimony was immaterial.[74]  Nevertheless, materiality is a mixed question of fact and law that is determined under a well-developed legal standard.  *Cobb*, 682 F.3d at 377.  The record from Copelin's second trial, reviewed in full by this Court, speaks for itself about the State's arguments and its reliance on various witnesses.

---

[71]    R. Doc. 49 at 13.

[72]    R. Doc. 25 at 38.

[73]    R. Doc. 36 at 7-8.

[74]    *Id.*

Here, based on a well-developed factual record and legal standard, the Court finds that, because the State has provided substantial "additional evidence supporting a guilty verdict," the undisclosed impeachment evidence is not material. *See Spence*, 80 F.3d at 995; *see also United States v. Webster*, 392 F.3d 787, 798-99 (5th Cir. 2004) (finding that petitioner's claim that impeachment evidence was improperly withheld was immaterial given that "the prosecution presented substantial evidence countering [petitioner's] claim . . . and the government's effort did not depend in any significant respect" on the testimony of the impeachable witness).

The evidence presented against Copelin at his second trial was as follows.  First, the State again called Officer Wheeler to testify about his investigation of the car parked near the scene of the robbery.  Wheeler's testimony at the second trial was similar to the testimony he provided in the first trial.  He again testified about how he was the first to arrive on the scene following the robbery, how he observed a vehicle blocking the flow of traffic, and that he canvassed the neighborhood to see if anyone knew to whom the car belonged.  And he again explained that after he was unable to identify the vehicle's owner, he conducted an inventory search of the car, and had the car towed.  And on cross-examination, he again told Copelin that the "car was well kept," and additionally noted that it "wasn't ransacked or anything like

24

that."[75]   However, Wheeler's testimony about where he found Copelin's Medicaid card changed between the two trials.  At the first trial and in his police report, Wheeler said that he found the Medicaid card on the passenger seat of the vehicle.  But at the second trial, Wheeler testified that he had been mistaken, and that he found the card in Copelin's wallet.[76]

Detective Alfred Harris, the lead detective assigned to the Homedale Inn robbery also testified for the State.[77]  Harris  arrived on the scene shortly after Wheeler, within five to ten minutes after the police were notified of the robbery.[78]   Upon arrival, Harris interviewed victims and other witnesses about the robbery.[79]  And after receiving a call on his radio, Harris relocated to Hawthorne Street to inspect the vehicle that was blocking traffic.[80]  Harris testified that he too observed a "blue Maxima parked sideways in the flow of traffic."[81]  Harris also noted that when he arrived on the scene, he "looked in the interior of the vehicle" and stated that Copelin's wallet was inside the

---

[75]     State Rec., Vol. 4 at 16:24-26 (Wheeler Testimony, Trial #2).
[76]     *Id.* at 10:2-9; 10:31-11:8.
[77]     State Rec., Vol. 4 at 43:14-16 (Harris Testimony, Trial #2).
[78]     *Id.* at 34:17-29.
[79]     *Id.* at 46:17-24.
[80]     *Id.* at 46:25-47:17.
[81]     *Id.* at 35:23-30.

car.[82]  He further represented that he viewed Copelin's drivers license, which was found inside the wallet.[83]

The following day, Harris testified that he learned that the vehicle that was blocking traffic the night before had been  reported stolen.[84]  He decided to "conduct a follow-up investigation" with the person who reported the car stolen because he found it unlikely that the car was stolen,  given that the keys were left in the vehicle.[85]  During his follow-up investigation, Harris learned that it was Howard, Copelin's girlfriend, who reported the car stolen.[86]  Harris and another officer went to Howard's house to ask her additional questions about her stolen-vehicle report.[87]  While the officers were inside Howard's house, they heard a "rustling" coming from the second floor of the residence.[88]  After discovering that  Howard's boyfriend, Copelin, was upstairs, the officers proceeded to climb the stairs to the second floor.[89]  Harris and his partner were initially unable to convince Copelin to come out of the bedroom.[90]  It is only after additional officers arrived as back-up that

---

[82]    *Id.* at 48:15-27.
[83]    *Id.* at 48:24-49.
[84]    *Id.* at 36:9-20.
[85]    *Id.* at 36:21-31.
[86]    *Id.* at 37:14-16.
[87]    *Id.* at 37:19-32.
[88]    *Id.* at 38:18-21.
[89]    *Id.* at 39:5-23.
[90]    *Id.* at 39:27-31.

Copelin agreed to come out.[91]   Both Copelin and Howard were then transported to the police station for further questioning.[92]   Harris testified that it was at this point that Howard voluntarily provided him with a statement, which she ultimately contradicted at Copelin's first trial.[93]

Aisha Howard also testified for the State.   Unlike her testimony at the previous trial, Howard's testimony at the second trial was consistent with the statement she gave the police when she was initially taken in for questioning. She testified about her former convictions,[94] that she was facing charges as an accessory after the fact for the Homedale Inn robbery, and that she was charged with perjury for the testimony she gave at Copelin's first trial.[95]   She also testified that she lied at the first trial because she was  "concerned . . . that [she] might be hurt by Darrius or anyone he is affiliated with."[96] Moreover, on cross-examination, Howard told Copelin that "I didn't want to see you go to jail because I loved you and you told me you loved me.  I was

---

[91]     *Id.* at 39:32-40:30.

[92]     *Id.* at 41:12-31.

[93]     *Id.* at 42:2-11.

[94]     State Rec., Vol. 4 at 70:20-71:11 (Howard Testimony, Trial #2).

[95]     *Id.* at 71:16-29; *see* State Rec., Vol. 4 at 32:26-33:9 (Prosecution Opening Statement, Trial #2) ("You will learn that Aisha Howard is charged with accessory to armed robbery.  You will learn that Aisha Howard had previously given a statement and it was untruthful.  You will hear that Aisha Howard is charged with perjury, but what you will also hear from Aisha Howard is what she told the police on that day.").

[96]     State Rec., Vol. 4 at 72:30-73:4 (Howard Testimony, Trial #2).

carrying your baby . . . . I wouldn't be here if it wasn't for you.  That's why I lied."[97]  She also testified that Copelin had called her "damn near every day off a cell phone from the jail" to "coach" her on what to say in her testimony at the first trial.[98]  Specifically, he asked her to lie about having seen him with a handgun the morning after the robbery.[99]  Howard also stated that Copelin had reached out to her since her testimony at his first trial and instructed her to "stay stupid" and "keep [her] fucking mouth shut" because she could not be a convicted as an accessory if the jury did not convict Copelin.[100]

Despite Copelin's threats, Howard provided detailed testimony about her recollection of events on September 8 and 9, 2012.  She testified that when she went to sleep on September 8, both Copelin and her vehicle were at the house,[101] but that when she woke up around 2:00 a.m., Copelin and her vehicle were gone.[102]  She tried to call Copelin's cell phone, but he did not answer.[103]  Sometime between 3:00 and 4:00 a.m. Copelin called her, first from a pay phone, and then from someone else's cell phone.[104]  When Copelin

---

[97]   *Id.* at 95:24-30.
[98]   *Id.* 95:32-96:2.
[99]   *Id.* at 74:15-19.
[100]  *Id.* at 74:20-75:5.
[101]  *Id.* at 77:18-78:2.
[102]  *Id.* at 78:3-16.
[103]  *Id.* at 78:17-19.
[104]  *Id.* at 79:1-18.

finally got through to Howard, the first thing he said was "I fucked up."[105]  He also informed Howard that he had to leave her car and therefore needed her to come get him at an address on Montegut Street.[106]

When Howard arrived at the designated address on Montegut Street, she saw Copelin exiting the house with a gun in his hand, dressed in a black shirt, black pants, and black shoes that Howard described as "not really" clean.[107]  While Howard began driving, Copelin put the gun in his lap and crouched down with his head in his lap.[108]  He asked Howard to take him to another location, telling her that "[i]f the car is still there, I am good," but that "[i]f the car is gone, I'm fucked."[109]  Copelin directed Howard to a residential neighborhood in the "Canal Boulevard area" where he said that he had left her car, but the car was gone.[110]  Copelin then told Howard that he had spent several hours the night before under a house a few blocks away, and asked her to drive him there next to see if he could recover a backpack with money he left there.[111]  Howard refused, telling him that it was too risky

---

[105]   *Id.* at 79:20-25.
[106]   *Id.* at 79:27-31.
[107]   *Id.* at 80:19-26; 82:27-32.
[108]   *Id.* at 80:23-26.
[109]   *Id.* at 80:31-81:7.
[110]   *Id.* at 81:8-82:5.
[111]   *Id.* at 82:8-21.

to go back for the money.[112]  Howard then testified that Copelin told her that they were "going to have to come up with something . . . to move both of [them] away from this."[113]  As part of the plan to distance themselves from the robbery, Copelin asked Howard to report her car stolen.[114]  Later that morning, Howard called the police and reported the car stolen.[115]

The State then introduced recorded jail calls that Copelin made to Howard while he was incarcerated.  On the tapes, the jury heard Copelin ask Howard, "did you tell them [the police] I had to leave the car?"[116]  The jury also heard Copelin tell Howard that "[a]ll of the stuff [she] told the police" was the "nail in [his] coffin."[117]  In its closing argument, the State emphasized both Howard's testimony and the recorded jail calls.  Specifically, the State told the jury that, "[f]or us, Aisha's testimony is extremely important because it puts all of the facts and circumstances together."[118]  The prosecutor also

---

[112]   *Id.* at 82:22-26.

[113]   *Id.* at 83:10-15.

[114]   *Id.* at 83:14-15.

[115]   *Id.* at 83:20-27.

[116]   R. Doc. 49-5 at 161:9-27 (Prosecution's Closing Argument, Trial #2).

[117]   State Rec., Vol. 4 at 36:17-29 (Prosecution's Opening Argument, Trial #2).

[118]   R. Doc. 49-5 at 161:28-162:4 (Prosecution's Closing Argument, Trial #2).

represented that she hoped the jury "paid attention to exactly what Darrius said to Aisha" about the "nail in the coffin."[119]

Finally, the State called several witnesses to testify about the physical description of the robber, which matched Copelin's physical description. The State introduced contemporaneous 911 calls and incident recalls into the record, which described the perpetrator as a "black male, tall, thin built, wearing knit cap/ski mask, black clothing, white surgical gloves, armed with black semi-automatic gun and carrying a black backpack."[120]  Two victims of the robbery, Jennifer Gostl, a bartender at the Homedale Inn, and Perry Putfark, the bar's owner, also provided physical descriptions. Gostl, testified that she had a "good opportunity" to observe the robber and was only a few feet away from him.[121]   Based on her observation, Gostl provided the following physical description of the robber:

> Q: Ms. Gostl, before he sits down would you say Mr. Darrius Copelin is a tall, thin athletic built man?
>
> A: Yes.
>
> Q: Would you say that he is the same height as the man that robbed the bar that night?
>
> A: Yes.

---

[119]     *Id.* at 160:28-161:31.
[120]     State Rec., Vol. 4 at 76:9-20 (Adams Testimony, Trial #2).
[121]     State Rec., Vol. 4 at 80:6-16, 87:12-18 (Gostl Testimony, Trial #2).

Q: Would you say he has the same skin complexion as the man that robbed you that night?

A: Yes.

Q: Same eyes as the man that robbed you that night?

A: Yes.

Q: Same voice as the man that robbed you that night?

A: Yes.[122]

Similarly, Putfark, who was so close to the robber that the robber grabbed his sleeve, testified that the robber was the same height, build, and had the same voice as Copelin.[123]   He also testified that the robber was wearing all black, a wool hat with eye holes, and black gloves with surgical gloves underneath.[124]   Detective Harris, who interviewed victims of the robbery that night, testified that their physical descriptions were more than what he would consider "general descriptions."[125]

Against this evidence, Copelin contends that Wheeler's testimony about the "location and state of Mr. Copelin's personal items" in the car is of "critical importance" to Copelin's defense.[126]   Copelin, who represented

---

[122]   *Id.* at 89:8-25.

[123]   State Rec., Vol. 4 at 93:13-30; 103:15-24 (Putfark Testimony, Trial #2).

[124]   *Id.* at 93:6-12.

[125]   State Rec., Vol. 4 at 52:9-17 (Harris Testimony, Trial #2).

[126]   R. Doc. 49 at 13.

himself at trial, presented his alibi in his opening statement, telling the jury

that on the night of the robbery he went to

> Passions, which is a gentleman's club on Downman Road
> in New Orleans East.  First, I park the car, then I went
> inside the club, [and] bought drinks.  Some time later I
> started talking with this young woman who danced at
> Passions.  At the end of the conversation she made a sexual
> proposal and I didn't refuse.  I went outside and I pulled
> the car behind the Domino's on Downman Road in New
> Orleans East.
>
> Now, I personally put my wallet and cell phone inside the
> console of the car.  The reason being [that] the clip on my
> cell phone kept digging into my hip and my wallet came out
> of my pocket a few times while she and I were together.  For
> the record, on that night I was wearing a pair of mesh
> shorts, basketball shorts, and the basketball shorts that I
> wore only had front pockets and that is why my wallet kept
> falling out.  So I had no other place to put my wallet, but
> the console and that is what I did, I put my wallet and cell
> phone inside the console.
>
> Now, when she and I w[ere] done, we both went back to the
> club . . . . I went back upstairs to have another drink, but
> when I got to the bar and I dug my hands in my pockets[,]
> I became conscious that I didn't have my wallet or the car
> key . . . . So I retraced my steps, but I didn't find [the car
> key].  When I walked outside and I went to the parking lot,
> the car was gone.[127]

Copelin asserts that Wheeler's testimony that his Medicaid card was in

his wallet, as opposed to sitting on the passenger seat as he testified during

the first trial, combined with Wheeler's testimony that the car was neat,

---

[127]    State Rec., Vol. 4 at 40:4-41:23 (Copelin Opening Statement, Trial
#2).

"ultimately . . . defeated the petitioner's defense about the car being stolen and trashed by the car thief, and possible robber."[128]  Copelin also argues that Wheeler's testimony at the second trial that the car "wasn't ransacked" is contradicted by his testimony at the first trial where, Copelin asserts, Wheeler testified "about the state of the vehicle and the strewn-about nature of its contents, which supported Mr. Copelin's defense that the car had been stolen from him earlier that evening."[129]  Notably, Copelin never suggests that Wheeler planted the evidence, and never contests that Wheeler found *his* wallet, cell phone, and watch in the vehicle.

The Court finds that impeaching Wheeler's testimony about the location of Copelin's Medicaid car and the cleanliness of the car, without more, would not significantly help Copelin.  The precise location of the Medicaid card does not suggest that the car was stolen.  Moreover, despite Copelin's assertion to the contrary, the Court finds that Wheeler's testimony about the overall cleanliness of the car was consistent across both trials.  At the first trial, Wheeler testified that he did not remember the vehicle being "unkept," and that it "appeared to be orderly and nice inside the car."[130]  And

---

[128]   R. Doc. 11 at 24.

[129]   *Id.* at 4.

[130]   R. Doc. 11-2 at 79:16-24 (Wheeler Testimony, Trial #1).

at the second trial, he similarly noted that the "car was well kept," and "wasn't ransacked or anything like that."[131]

And even though Wheeler's testimony made Copelin's theory of the case less plausible, his theory—that someone stole his girlfriend's grandmother's car and committed the robbery—was unconvincing for other reasons. The only evidence suggesting that the car had been stolen was that Copelin's girlfriend reported to the police that her vehicle was stolen the morning after the robbery. But that evidence was negated by Howard's testimony that she reported the car stolen only because Copelin told her to do so. There was no evidence that Copelin had ever been to a gentleman's club the night of the robbery, much less that he had an encounter with a woman in his girlfriend's car. His opening statement did not even suggest why he took off his watch and left it in the car. The plausibility of the car's being stolen is also undermined by the fact that Copelin's valuables, including his watch, cell phone, and wallet, were left in the vehicle with the keys. And as previously discussed, it was that the keys were left in the car that raised Harris's suspicions about Howard's stolen-car report in the first place. If, as Copelin claims, the person who stole his car went on to commit

---

[131]    R. Doc. 11-4 at 16:24-26 (Wheeler Testimony, Trial #2).

the robbery at the Homedale Inn, it would defy common sense that the robber would rob a bar, but would leave valuables inside an unlocked car.

And while the undisclosed impeachment evidence goes to Wheeler's general credibility, it does little to question the credibility of his testimony in Copelin's case.  Courts have found that a defendant's inability to impeach a State witness based on undisclosed and unrelated prior bad acts may not be material for *Brady* purposes, particularly as compared to undisclosed impeachment evidence that is case-specific.  *See, e.g.*, *United States v. Lawson*, 810 F.3d 1032, 1044 (7th Cir. 2016) (rejecting defendant's argument that an officer's disciplinary record in an unrelated case made it "more probable" that he tampered with evidence). Here, the undisclosed information pertained to Wheeler's misconduct in an unrelated case with different underlying facts.   Wheeler's prior misconduct resulted from his filing a false police report to cover up his own misconduct.  But in Copelin's case, there is no evidence to support a theory that Wheeler was covering for himself for any misconduct related to his limited role in the case.  To the contrary, the record mainly supports the conclusion that Wheeler followed the police department's standard procedure to tow a car that was impeding traffic, and to inventory any personal belongings found in the vehicle.

Moreover, even if a jury were to find that Wheeler was not a credible witness after learning of his prior misconduct, the bulk of his testimony is corroborated by other witnesses. There is very little evidence that the jury could have found Wheeler to have fabricated in this case, given that most of his testimony is corroborated and undisputed. *See Reeder v. Vannoy*, 978 F.3d 272, 278 (5th Cir. 2020) ("Certainly, undisclosed impeachment evidence is more likely to be considered material where the prosecution's case relies primarily on a single witness."). The testimony of two witnesses to the robbery, Jennifer Gostl, a bartender at the Homedale Inn, and Perry Putfark, the bar's owner, corroborate Wheeler's testimony that he was informed that the robber ran toward Hawthorne Street.[132] Additionally, several aspects of Wheeler's testimony about the vehicle he searched are corroborated by Detective Alfred Harris, the lead detective on the robbery.[133] Harris corroborates Wheeler's account of the location of the car, and that the items found inside the car belonged to Copelin. Copelin too corroborates he left these items inside the car. The only aspect of Wheeler's testimony that Harris does not mention is the location and condition of Copelin's items inside the vehicle.

---

[132]  State Rec., Vol. 4, at 80:23-32 (Gostl Testimony, Trial #2); *id.* at 96:32 (Putfark Testimony, Trial #2).

[133]  State Rec., Vol. 4 at 43:14-16 (Harris Testimony, Trial #2).

The materiality of Wheeler's prior misconduct is also limited because Copelin successfully impeached Wheeler with his prior inconsistent testimony.  At the first trial, Wheeler testified under oath that he found petitioner's Medicaid card on the passenger seat, but testified at the second trial that he found the card in the wallet in the center console.[134]  On cross-examination at the second trial, Copelin asked Wheeler several times about his changed testimony as to the location of the Medicaid card, and again emphasized the inconsistency in his closing statement.[135]  And as noted, the Court finds no support for Copelin's argument that Wheeler's testimony changed in any other material way between the two trials.  Thus, any "incremental impeachment value" that Copelin would have gained from disclosure of Wheeler's termination does not raise a reasonable possibility that, had the information been disclosed, the jury would have believed the car was stolen by a robber, particularly in light of the other evidence of Copelin's guilt.  *See Pyles v. Johnson*, 136 F.3d 986, 1000 (5th Cir. 1998); *see*

---

[134]    *Id.* at 16:9-17:27.

[135]    State Rec., Vol. 4 at 173:15-32 (Copelin's Closing Statement, Trial #2) ("Kevin Wheeler's testimony changed.  Twice he said that my Medicaid card was on the passenger seat.  He wrote a report about it, a police report and he testified at the prior hearing, at the July 9, 2014 hearing, that it was on the passenger seat . . . and then now I am going to put it in his wallet . . . which made it convenient to make it seem like I'm the person who committed the crime.  [And] now we are going to . . . untrash the car.").

*also United States v. Hamaker*, 455 F.3d 1316, 1328-29 (11th Cir. 2006) (finding no *Brady* violation because the additional impeachment value to be gained from questioning a witness on his status as a government informant in an unrelated case was "weak at best"). For these reasons, the Court finds that the undisclosed impeachment evidence was not material for the purposes of petitioner's *Brady* claim.

In sum, the Court concludes that the undisclosed evidence does not raise a reasonable probability that the result of the proceeding would have been different had Copelin been able to use the impeachment evidence at his second trial.

### B.    Confrontation Clause

Copelin also represents that his constitutional right to confront Wheeler was improperly restricted because he was prevented from cross-examining Wheeler about his termination from the police department.[136] The Confrontation Clause of the Sixth Amendment provides that: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. As recognized by the Supreme Court:

---

[136]    R. Doc. 27 at 7.

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.

*Davis v. Alaska*, 415 U.S. 308, 316 (1974).   However, the Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish."   *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam)).

First, the Court finds that petitioner has not shown that his rights under the Confrontation Clause were violated by his inability to cross-examine Wheeler about his termination.   In *Davis v. Alaska*, the Supreme Court held that there is a Sixth Amendment right to confront and impeach a witness by "revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities *in the case at hand.*"   415 U.S. at 316 (emphasis added).   The Fifth Circuit has held that "there is no constitutional right to impeach the general credibility of a witness with evidence of prior bad acts" that are unrelated to the case at hand, and instead reflect on the witness's overall propensity for truthfulness. *Cloud v. Thomas*, 627 F.2d 742, 743 (5th Cir. 1980).   Accordingly, in cases

where there is no suggestion that cross-examination would show evidence of "bias, prejudices, or ulterior motives on the part of the officer [related to the case at hand,]" there is no Sixth Amendment right to "the admission of all character evidence of whatever relevance and probative value." *Id.* at 744; *see also United States v. Skelton*, 514 F.3d 433, 445 (5th Cir. 2008), *cert. denied*, 450 U.S. 1041 (1981) ("[T]his court has held that although Rule 608 permits the impeachment of the general credibility of a witness, there is no constitutional right to do so.").

In *Cloud*, the government rested its case entirely on one witness, the defendant's arresting officer. 627 F.2d at 743. In a petition for habeas corpus, the defendant relied upon his Sixth Amendment right to confront and cross-examine witnesses to challenge the trial judge's refusal to allow cross-examination of the officer as to a prior incident in which the officer filed a false report in an unrelated case. *See id.* The incident resulted in the officer's suspension, but not criminal charges. *Id.* "In the absence of a criminal conviction, the trial judge refused to permit cross-examination into the incident." *Id.* In affirming the denial of a writ of habeas corpus, the Fifth Circuit stated that, unlike in *Davis*, the defendant sought cross-examination solely to impeach the officer's general credibility with a prior bad act, and not to show bias or prejudice in the case at hand. *Id.* The *Cloud* court held that,

although testimony into the officer's suspension may "have been helpful to the jury, [the court] cannot hold that the sixth amendment is coextensive with the Federal Rules of Evidence or that it terminates the discretion of state judges to decide on the desirability of admitting such testimony into evidence." *Id.* at 745.

Here, as in *Cloud*, there is no indication that petitioner's cross-examination of Wheeler about his termination for an unrelated incident of false reporting would show any biases, prejudices, or ulterior motives related to Copelin's case. *Id.* at 743.  In his objections, Copelin incorrectly relies on *Burbank v. Cain*, 535 F.3d 350 (5th Cir. 2008), to argue that he has a Sixth Amendment right to inquire fully into Wheeler's termination and dishonesty.[137]  In *Burbank*, the petitioner was afforded habeas relief after he was prevented from cross-examining an alleged eyewitness about her proposed plea agreement in which she would serve only one year in prison, as opposed to a possible twenty years in prison.  *Id.* at 358.  But in *Burbank*, unlike in this case, the court found a constitutional right to inquire into the witness's plea deal to show bias and ulterior motives—namely that a jury could believe the witness "was testifying to curry favor with the state," which would have "seriously undermined" the state's case.  *Id.* at 359.  Here,

---

[137]    R. Doc. 49 at 14-15.

Copelin wanted to cross-examine Wheeler to impeach his general credibility, arguing that the "jury would have viewed [W]heeler's testimony [as] less credible had it known the ex officer had a history of filing false police reports."[138]  Accordingly, Copelin's inability to cross-examine Wheeler about his termination for filing false police reports did not violate Copelin's Sixth Amendment right.

Even assuming there was a Confrontation Clause violation, petitioner is entitled to relief only if the error was not harmless.  To determine whether an error was harmless, the Court must engage in the following harmless-error analysis:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.  Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.  These factors include[:] [1] the importance of the witness' testimony in the prosecution's case, [2] whether the testimony was cumulative, [3] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, [4] the extent of cross-examination otherwise permitted, and [5] of course, the overall strength of the prosecution's case.

*Van Arsdall*, 475 U.S. at 684.  In habeas proceedings, for "reasons of finality, comity, and federalism," *Davis v. Ayala*, 576 U.S. 257, 267-68 (2015), a more

---

[138]    R. Doc. 27 at 6.

relaxed harmless-error review is applied, *Kittelson v. Dretke*, 426 F.3d 306, 319-20 (5th Cir. 2005).  A petitioner who otherwise suffered a constitutional error is only entitled to habeas relief if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'"  *Davis*, 576 U.S. at 267-68 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

Upon review, the Court finds that, even if there was a Confrontation Clause violation, the error was harmless.   First, although Wheeler's testimony was not insignificant, it was not central to the State's theory of the case.  *Van Arsdall*, 475 U.S. at 684.  Wheeler was the first officer to arrive at the scene of the robbery, and conducted the inventory search of a vehicle parked near the location of the robbery that contained Copelin's personal belongings.[139]  But he was not "crucial to the state's case," given that he admittedly "didn't handle the armed robbery [investigation],"[140] and "never

---

[139] R. Doc. 11-4 at 7:9-11; 11:30-12:5 (Wheeler Testimony, Trial #2).  The State concedes in its response to petitioner's objections that Wheeler's testimony was important to the State's case. It notes that, given the State's "efforts to limit the cross-examination of Officer Wheeler prior to trial by filing the *Motion in Limine*, we risk losing credibility with this Court by arguing the testimony of Officer Wheeler was unnecessary, or that his cross-examination on these matters was immaterial."  R. Doc. 36 at 7.

[140] R. Doc. 11-4 at 21:8-10 (Wheeler Testimony, Trial #2).

saw the perpetrator."[141]  *Contra Greene v. Wainwright*, 634 F.2d 272, 275 (5th Cir. 1981) (finding a violation of the Confrontation Clause when petitioner was limited in his cross-examination of the prosecution's only eyewitness, who provided the "essential link to the prosecution's case").  The Court thus finds that Wheeler's testimony was not central to the prosecution's theory of the case.  *Van Arsdall*, 475 U.S. at 684.

Second, as previously discussed, key portions of Wheeler's testimony were cumulative and corroborated by other witnesses.  *See id.*  Petitioner objects to the Magistrate Judge's purported "attempt to diminish Officer Wheeler's testimony on the grounds that he 'was not the sole responding officer.'"[142]  In his objections, Copelin argues that such a finding "fails to 'assum[e] that the damaging potential of the cross-examination [would be] fully realized,'" and that if Copelin had been able to cross-examine Wheeler about his termination, it "could have led [the jury] to distrust the testimony of not only Wheeler, but all police officers in this case."[143]  Petitioner then explicitly tries to cast doubt on Harris's testimony based on Wheeler's prior falsification of police records, noting that "Wheeler lied about his misconduct

---

[141]  *Id.* at 24:10-11.
[142]  R. Doc. 49 (quoting the R&R, R. Doc. 26 at 46).
[143]  *Id.*

*in concert with another officer*."[144]   But there is no evidence in the record that Harris lied under oath, or that he falsified police records in this case, or any other case.  Nor is the Court aware of any evidence that would suggest that Harris's credibility should be questioned because of Wheeler's prior, unrelated misconduct.  Notably, Harris worked in a different division of the New Orleans Police Department than Wheeler, and Wheeler's involvement in Harris's investigation was limited to his arriving first on the scene.  Accordingly, the Court rejects petitioner's speculation that the damaging potential of his cross-examination of Wheeler would discredit a different officer's testimony that corroborates key portions of Wheeler's account.

Third, Copelin was given the opportunity to cross-examine Wheeler about the contents of the car.  Specifically, Copelin was able to cross-examine Wheeler "at length"[145] about why he suspected that the car was related to the robbery, and about the location of the items found inside the car.  This allowed Copelin to question Wheeler about what Copelin claims to be the "critical part" of Wheeler's testimony: "the location and state of Mr. Copelin's personal items."[146]   Given Copelin's otherwise extensive cross-examination of Wheeler, which included impeaching Wheeler for inconsistent testimony,

---

[144]   *Id.* at 17.
[145]   R. Doc. 26 at 47.
[146]   R. Doc. 49 at 13.

the Court concludes that, even if Copelin had been able to further discredit Wheeler with additional impeachment evidence, it would not have had a "substantial and injurious effect." *Brecht*, 507 U.S. at 637; *see United States v. Sipe*, 388 F.3d 471, 489 (5th Cir. 2004) ("Evidence which impeaches an already impeached witness is by definition cumulative."); *Robinson v. Quarterman*, 207 F. App'x 492, 497 (5th Cir. 2006) (affirming a finding of harmless error for a Confrontation Clause violation because, although "the introduction of [the witness's] deferred adjudication status and residency in the county jail may have further damaged her credibility, it would not be impeaching otherwise reputable testimony, but only adding one more reason to the two already given to the jury as to why [the witness] was not credible").

Finally, to determine whether any error was harmless, the Court considers the overall strength of the State's case. *Van Arsdall*, 475 U.S. at 684; *Slaughter v. Epps*, 326 F. App'x 731, 733 (5th Cir. 2009) (per curiam). As discussed in relation of Copelin's *Brady* claim, the State did provide evidence aside from Wheeler that tied Copelin to the robbery. Petitioner notes that the Fifth Circuit has found Confrontation Clause violations not harmless where "there was no physical evidence linking the accused to the

47

crime."[147]   The Court finds that, given the lack of physical evidence directly linking Copelin to the armed robbery, the State's case was not airtight.   But, unlike in the cases cited by petitioner, the State here did not limit Copelin's ability to cross-examine their only witness, *contra Burbank*, 535 F.3d at 352, or a witness with uncorroborated testimony, *contra Taylor*, 545 F.3d at 336-37.   And this case does not turn "entirely on the credibility of the complaining witness."   *Contra Kittelson*, 426 F.3d at 322-23.   The Court also notes that the lack of an overwhelmingly strong case by the State and the lack of physical evidence, do not, by themselves, require a finding that the error was not harmless.   *See Divers v. Warden, La. State Penitentiary*, No. 07-2030, 2010 WL 4291330, at *12 (W.D. La. Aug. 17, 2010), *report and recommendation adopted*, 2010 WL 4291289 (W.D. La. Oct. 26, 2010), *aff'd sub nom. Divers v. Cain*, 698 F.3d 211 (5th Cir. 2012) ("A[lthough] the state's case was not overwhelmingly strong, in that the state could not present multiple eyewitnesses and did not present physical evidence . . . in light of the resolution of the other *Van Arsdall* factors, this court cannot find that the Louisiana Second Circuit unreasonably applied federal law.").   Accordingly, while the State's case against Copelin lacked direct evidence, it

---

[147]   R. Doc. 49 at 15-16 (citing *Taylor v. Cain*, 545 F.3d 327, 337 (5th Cir. 2008); *Kittelson v. Dretke*, 426 F.3d 306, 312, 322-23 (5th Cir. 2005); *Burbank v. Cain*, 535 F.3d 350, 352-54 (5th Cir. 2008)).

was still strong.  Any error the trial court made as to Copelin's right to cross-examine Wheeler was harmless.

In sum, after considering the above factors, the Court finds that petitioner has not shown that a violation of his right to confront an adverse witness, if such a violation occurred, resulted in actual prejudice to him. Accordingly, the Court denies Copelin's request for habeas relief on his Confrontation Clause claim.


### C.    Double Jeopardy

Copelin also asserts a double-jeopardy claim arising out of the state's reinstitution of charges against him after his first trial ended in a mistrial. He first raised this claim on direct appeal.  Following Copelin's second trial, he appealed to the Louisiana Fourth Circuit, arguing that "the mistrial the district court declared at the end of his first trial was not manifestly necessary and was undertaken without his consent,"[148] and therefore "his second trial and conviction violate state and federal principles of double jeopardy." *Copelin*, 206 So. 3d at 995.  The Louisiana Fourth Circuit found that Copelin was procedurally barred from challenging the mistrial because he did not

---

[148]    Notably, Copelin moved for a mistrial earlier during jury deliberations, but the trial court denied it.  State Rec., Vol. 4 at 3:1-27 (Trial #1 Transcript).  Copelin did not renew his request for a mistrial.

object or invoke the appropriate remedy by seeking an automatic stay under Article 775.1.  *Id.* at 1000.  Louisiana Code of Criminal Procedure Article 775.1 provides that:

> If a judge orders a mistrial, then upon motion of either the state or the defendant, the court shall order an automatic twenty-four-hour stay of all proceedings in which either the state or the defendant may take an emergency writ application to the appropriate reviewing courts with appellate jurisdiction, including the Louisiana Supreme Court.  The jury shall not be released pending the stay unless both the state and defendant agree to release the jury.

La. Code Crim. Proc. art. 775.1.  As characterized by the state appellate court, "the apparent purpose for enacting Article 775.1 was to create a procedural device for the aggrieved party . . . to request a twenty-four hour automatic stay of the proceedings—thereby delaying the release of the jury—in order to file an emergency writ application with the appropriate appellate court." *Copelin*, 206 So. 3d at 1000.  The court concluded that, because Copelin failed to seek emergency review of the mistrial order, he waived his right to challenge the mistrial on appeal.  *Id.*  The Louisiana Supreme Court denied petitioner's later writ application, without assigning additional reasons. *State v. Copelin*, 227 So. 3d 286 (La. 2017).

In Copelin's habeas petition, he argues that his constitutional protection against double jeopardy was violated when he was twice placed

on trial for the same charges.[149]  His double-jeopardy claim stems from his assertion that, because the jury in his first trial was not "hopelessly or genuinely deadlocked," there was no "manifest necessity" for a mistrial.[150] Magistrate Judge North found that Copelin's double-jeopardy claim fails based on the state court's finding that his objection to the mistrial was procedurally defaulted, and the resulting conclusion that the mistrial was "proper under state and federal law due to a deadlocked jury."[151]  Petitioner raises two objections to the Magistrate Judge's analysis on his double-jeopardy claim, arguing that his claim is not defaulted and warrants relief.[152] In response to these objections, the State represents that it agrees with the Magistrate Judge's findings on petitioner's double-jeopardy claim.[153]

1. *State Procedural Bar*

First, Copelin contends that the Magistrate Judge erred in finding that he waived his habeas double-jeopardy claim in state court proceedings.[154] He explains that  an "argument is 'defaulted' and may not be considered on

---

[149]    R. Doc. 11 at 10.
[150]    R. Doc. 1 at 6.
[151]    R. Doc. 26 at 19.
[152]    R. Doc. 49 at 27.
[153]    R. Doc. 36 at 1-2.
[154]    R. Doc. 27 at 5.

federal habeas review when state courts decline to reach it 'pursuant to an independent and adequate state procedural rule.'"[155]  Copelin argues, for the first time in his reply brief,[156] that Article 775.1 is not an "independent and adequate state procedural rule" because it has not been "firmly established and regularly followed."[157]

"As a rule, a state prisoner's habeas claims may not be entertained by a federal court when (1) a state court [has] declined to address [those] claims because the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (internal quotations omitted).  A state procedural requirement is considered "adequate" if it is "firmly established and regularly followed." *Walker v. Martin*, 562 U.S. 307, 316 (2011) (internal quotation marks omitted).   It is also considered adequate "if courts have applied the [procedural bar] in the vast majority of similar claims." *Duncan v. Cain*, 278 F.3d 537, 542 (5th Cir. 2002).

---

[155]   R. Doc. 49 at 28 (quoting *Johnson v. Lee*, 578 U.S. 605, 606-07 (2016) (per curiam)).

[156]   In his habeas petition and initial objections to the R&R, Copelin does not argue that Article 775.1. is not an "adequate and independent" procedural rule, but instead argues that it is "doubtful that Art. 775.1 applies to mistrial orders made sua sponte without the defendant['s] consent."  R. Doc. 27 at 5; *see also* R. Doc. 11 at 10.

[157]   R. Doc. 49 at 28.

Here, the state appellate court refused to address Copelin's claim by relying on Louisiana's rule requiring a contemporaneous objection to the declaration of a mistrial.  The state appellate court concluded that, "[g]iven that Mr. Copelin failed to object or to invoke the appropriate remedy provided for by Article 775.1, we find the assignment of error was not preserved for review." *Copelin*, 227 So. 3d at 1000.  Accordingly, the "state court declined to address [petitioner's] claims because [he] had failed to meet a state procedural requirement."  *Walker*, 562 U.S. at 316.

The next question, and the basis of petitioner's objection, is whether this procedural rule is "firmly established and regularly followed" by Louisiana courts in previous cases.[158]  *Id.*  As an initial matter, the Court notes that Copelin has waived his argument regarding whether there was an "adequate and independent" state ground.  *See Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived."); *United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005) ("Arguments raised for the first time in a reply brief, even by pro se litigants . . . are waived." (citing *Knighten v. Comm'r*, 702 F.2d 59, 60 n.1 (5th Cir. 1983))).

---

[158]    R. Doc. 49 at 23-24.

But even assuming that Copelin had timely raised this objection, the Court finds that Article 775.1's emergency review of a mistrial is an "adequate and independent" state procedural requirement that bars habeas relief. The Court "presume[s] the adequacy and independence of a state procedural rule when the state court expressly relies on it in deciding not to review a claim for collateral relief." *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995) (citing *Harris v. Reed*, 489 U.S. 255, 262 (1989)). Copelin can overcome this "presumption of adequacy" by establishing that Article 775.1 is not "strictly or regularly followed." *Id.* Accordingly, Copelin "has the burden of establishing that the state did not strictly or regularly follow a procedural bar around the time of his denial of relief in state court." *Rogers v. Mississippi*, 555 F. App'x 407, 408 (5th Cir. 2014) (per curiam) (citing *Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997)).

As noted by the state appellate court in this case, "[t]here is scant jurisprudence construing, or even citing, Article 775.1, which was enacted in 2004." *Copelin*, 227 So. 3d at 999. But "scant jurisprudence" about a state procedural rule does not necessitate a finding that the rule is not "strictly or regularly followed" when applied to "classes of claims" such as Copelin's. *See Sones*, 61 F.3d at 417.

Indeed, the Court has found two published state-court decisions interpreting the effect of the automatic-stay provision of Article 775.1 following an order of mistrial. Neither case is inconsistent with the rule as applied in Copelin's case. For example, in *State v. Lewis*, the Louisiana Fourth Circuit held that, because the defendant failed to invoke Article 775.1's emergency-review provision, he waived his argument that further prosecution was barred under the Double Jeopardy Clause. 292 So. 3d 945, 950-51 (La. App. 4 Cir. 2020). This is precisely what happened in Copelin's case.

Petitioner submits that the rule as applied in his case was "squarely rejected" by the Louisiana Third Circuit in *State v. Holloway*, 297 So. 3d 957 (La. App. 3 Cir. 2020).[159] But the *Holloway* case involved a distinct legal issue, and does not undermine Copelin's state-court decision. Specifically, the *Holloway* court addressed whether a failure to invoke Article 775.1 constitutes consent to a mistrial. *Id.* at 965-66. The Court found that Holloway's consent was statutorily required for the authorization of a mistrial on certain claims,[160] and that his non-invocation of Article 775.1 did

---

[159]   R. Doc. 49 at 24.

[160]   Specifically, the *Holloway* court addressed Article 591 of the Louisiana Code of Criminal Procedure, which provides that a defendant may not be tried twice for the same offense, except where a mistrial has been legally ordered for a reason specifically enumerated in Article 775, or

not amount to statutory consent. *See id.* ("[I]t is clear that requiring a contemporaneous objection to an *improperly granted mistrial* does not advance the purpose of the rule." (emphasis added)). In Copelin's case, the judge did not rely on Copelin's consent as the statutory basis of the mistrial, and instead relied on the jury's inability to reach a verdict. Copelin's failure to invoke Article 775.1 determined whether he could later object to the mistrial, while Holloway's failure to invoke Article 775.1 determined whether his mistrial was statutorily authorized in the first place. The effect of the non-invocation of Article 775.1 was therefore different as to Holloway and Copelin. The divergent outcomes in these cases are therefore not inconsistent.

Because these cases are fully reconcilable with Copelin's state-court decision, the Court finds that petitioner has not rebutted Article 775.1's "presumption of adequacy" by establishing that the Louisiana rule has not been "strictly or regularly followed" in the majority of similar claims. Copelin has "not identified specific instances when [a Louisiana court] did not apply

---

with the defendant's consent. La. Code Crim. Proc. art. 591. In *Holloway*, defendant's consent was necessary because the mistrial, as to certain claims, was not authorized by Article 775. Copelin's mistrial, on the other hand, was based on the jury's inability to reach a verdict, a reason expressly authorized by Article 775. La. Code Crim. Proc. art. 775 ("A mistrial may be ordered, and in a jury case the jury dismissed, when: . . . (2) The jury is unable to agree upon a verdict.").

the procedural bar[] to claims identical or similar to those he seeks to raise." *See Rogers*, 555 F. App'x at 408.  He has therefore not met his burden.   *Id.*

In an abundance of caution, however, the Court will also consider the merits of petitioner's claim.  *See Roberts v. Thaler*, 681 F.3d 597, 605, 608 (5th Cir. 2012) (noting that a court may choose to address the merits, "especially when procedural default turns on difficult questions of state law").

### 2. *The Merits*

In his objections, Copelin states that the Magistrate Judge should have focused on the "obvious question of law," which is whether "the trial judge in Mr. Copelin's state case took adequate care to ensure the jury was genuinely deadlocked."[161]   Copelin contends that, had the Magistrate Judge decided this issue, he would have concluded, based on the record, that the jury was not genuinely deadlocked and that the judge abused her discretion in granting the mistrial.[162]   Copelin represents that the trial court "hastily and unexpectedly discharged the jury without consulting the parties," and determined only that "the jury had concluded, as midnight approached, that

---

[161]   R. Doc. 27 at 2.
[162]   *Id.*; R. Doc. 49 at 24.

57

it was not going to reach a verdict that night," not that it would be unable to reach a verdict at any point.[163]

The Fifth Amendment's Double Jeopardy Clause protects a criminal defendant from repeated prosecutions for the same offense. "When a defendant's first trial is terminated prior to [a] verdict, the circumstances of the termination determine whether the Fifth Amendment bars retrial." *Martinez v. Caldwell*, 644 F.3d 238, 243 (5th Cir. 2011). According to Supreme Court precedent, "whether under the Double Jeopardy Clause there can be a new trial after a mistrial has been declared without the defendant's request or consent depends on whether 'there is a manifest necessity for the (mistrial), or the ends of public justice would otherwise be defeated.'" *United States v. Dinitz*, 424 U.S. 600, 606 (1976) (quoting *Green v. United States*, 355 U.S. 184, 187-88 (1957)); *United States v. Palmer*, 122 F.3d 215, 218 (5th Cir. 1997) ("[A] trial court cannot retry a defendant after declaring a mistrial *sua sponte*, unless the mistrial is justified by 'manifest necessity.'" (citing *United States v. Jorn*, 400 U.S. 470 (1971))). A "prototypical example" of "manifest necessity" is the declaration of a mistrial because of a hung jury. *Oregon v. Kennedy*, 456 U.S. 667, 672 (1982).

---

[163]    R. Doc. 27 at 2.

A court's decision to grant a mistrial when a jury is deadlocked is "accorded great deference by the reviewing court." *Arizona v. Washington*, 434 U.S. 497, 509-10 (1978).  This is because the "trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." *Id.* at 510 n.28.  A finding that a jury is deadlocked "is essentially a trial court finding of fact," and is therefore entitled to deference in habeas actions by 28 U.S.C. § 2254(d), which instructs reviewing courts to "afford a presumption of correctness to a state court's factual findings." *Fay v. McCotter*, 765 F.2d 475, 477 (5th Cir. 1985) (citing *Wainwright v. Witt*, 469 U.S. 412 (1985)).

The trial transcript from Copelin's first trial notes that the jury deliberated from 6:45 p.m.[164] until 11:21 p.m. when the jurors re-entered the court room and had the following exchange with the judge:

> THE COURT:      Ladies and gentleman of the jury, y'all have been deliberating for almost going on five hours.   Do   you   believe   any   further deliberations would assist you in rendering a verdict?
>
> FOREPERSON:   For tonight?
>
> THE COURT:      Yes.

---

[164]   R. Doc. 11-3 at 2:2 (Trial #1 Transcript).

| | |
|---|---|
| FOREPERSON: | Yes. |
| JUROR: | I think so. |
| THE COURT: | You do?  All right.  Go ahead.[165] |

At 11:29 p.m., the jury were called back into the courtroom after sending the

court a note:

| | |
|---|---|
| THE COURT: | I have received a note from the jury that reads as follows: "We will be unable to come to a final decision tonight.  We apologize."  Who is the jury Foreperson? |
| FOREPERSON: | I am. |
| THE COURT: | All right.  And do you feel that any further deliberations would assist you to render a verdict? |
| FOREPERSON: | No. |
| THE COURT: | No?  All right.  So I would like to thank you for your service.  You are discharged.[166] |

Here, "[g]iven the 2254(d) presumption," along with the "great

deference" given to the trial court, *id.* at 477-78, this Court does not find that

the state trial court abused its broad discretion in concluding that the jury

was deadlocked, and that "manifest necessity" existed for the declaration of

a mistrial.  After a two-day trial, and almost five hours after beginning

deliberations, the jury initially informed the Court that further deliberations

---

[165]   *Id.* at 5:12-32.
[166]   *Id.* at 6:4-32.

would help them reach a verdict. *Copelin*, 206 So. 3d at 995. But after a brief continuation of deliberations, the jury wrote the judge a note, informing her that it would be unable to make a final decision that night. And unlike petitioner's assertion that the trial judge then "hastily and unexpectedly" discharged the jury,[167] the judge proceeded to call the jury into the courtroom and ask the foreperson whether further deliberations would assist the jury in reaching a verdict. After the foreperson replied "no," the court declared a mistrial.

Courts have held that judges did not abuse their discretion in declaring a mistrial under similar circumstances. *See, e.g.*, *United States v. Nelson*, 599 F.2d 714, 718 (5th Cir. 1979) (holding that the trial court did not abuse its discretion when it "inquired of the jury foreman and of the jury itself whether further deliberation might produce agreement [and] upon a negative response, . . . declared a mistrial"); *Grogan v. United States*, 394 F.2d 287, 289-90 (5th Cir. 1967) (finding that the trial court did not abuse its discretion in declaring a mistrial after the jury deliberated for five hours, and given "the late hour and the inability of the jurors to agree on a verdict for . . . those two defendants"); *United States v. Brahm*, 459 F.2d 546, 550 (3d Cir. 1972) (affirming the judge's finding of a mistrial, noting that it was

---

[167]    R. Doc. 27 at 2.

"not unreasonable or unusual for the court to dismiss the jury after 6 P.M." in a case where the jury had deliberated for five hours following a two-day trial).

Copelin raises two main challenges to the court's decision to declare a mistrial. First, he notes that the judge failed to inquire with the individual jurors about whether they were genuinely deadlocked.[168] However, there is no requirement that a judge speak with each juror in determining whether a mistrial is necessary. In fact, the Fifth Circuit has explicitly rejected attempts to "mandate a particularized juror inquiry," because the review of mistrials "is incompatible with a mechanical application of rules and exceptions." *Fay*, 765 F.2d at 478 (citing *United States v. Gordy*, 526 F.2d 631, 635 (5th Cir. 1976)). Here, the full jury was present for the discussion with the judge and heard the foreperson's answer that additional time would not help them arrive at a verdict. In the earlier colloquy, an individual juror spoke in favor of additional time for deliberation, even after the foreperson had answered.[169] No juror did so now. Thus, in light of the discretion afforded to the trial court, the Court does not find that the trial court erred by crediting the foreperson's statement that the jury was deadlocked.

---

[168]   *Id.* at 3; R. Doc. 49 at 24.

[169]   R. Doc. 11-3 at 5:12-32 (Trial #1 Transcript).

Finally, Copelin asserts that the trial court did not take adequate care in ensuring the jury was truly deadlocked because it did not consider possible alternatives to a mistrial.[170]  The Fifth Circuit has previously rejected this argument as well, asserting that "a trial judge does not err for failing to consider or adopt a specific alternative for a mistrial."  *Cherry v. Director, State Bd. of Corrections*, 635 F.2d 414, 418 (5th Cir. 1981) (en banc); *see also Fay*, 765 F.2d at 478 (rejecting petitioner's claim of error based on the allegation "that the trial court did not consider possible alternatives to the grant of a mistrial," and instead "defer[ring] to the trial judge's chosen course [where] the judge's finding of deadlock is fairly supported by the record").  Therefore, Copelin's assertion that the trial court had to consider alternatives on the record is without merit.

In sum, the Court finds that the judge in Copelin's first trial did not abuse her discretion in declaring a mistrial, and petitioner is not entitled to habeas relief on his claim of double jeopardy.

---

[170]   R. Doc. 49 at 24.

### D.    Other Evidence

Copelin contends that the trial court's improper admission of evidence about his 2002 bank robbery conviction prejudiced him.[171]  As noted in the R&R, Copelin "assigned and briefed appellate error [on this claim], [and] addressed only state evidentiary law."[172]  The Magistrate Judge did not address this objection on the grounds that federal habeas relief is unavailable for errors in state law.[173]

Petitioner does not object to the Magistrate's finding on this claim. This Court therefore reviews the R&R for plain error.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b) advisory committee's note (1983) ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.").  The Court finds no plain error.

Copelin's other-evidence claim fails because it is based solely on state-law violations.  Such a claim is not cognizable on habeas review.  *See Lisenba*

---

[171]    R. Doc. 11 at 18-22.
[172]    R. Doc. 26 at 38.
[173]    *Id.* at 37-39.

*v. California*, 314 U.S. 219, 228-29 (1941) ("We do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence."); *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) ("We have repeatedly admonished that 'we do not sit as a super state supreme court' in a habeas corpus proceeding to review errors under state law." (quoting *Martin v. Wainwright*, 428 F.2d 356, 357 (5th Cir. 1970))). Because the Court finds no clear error in the Magistrate Judge's resolution of Copelin's other-evidence claim for habeas relief, that claim is denied.

### E.      Fourth Amendment Search and Seizure

Copelin's final objection stems from his claim that the trial court erroneously admitted evidence that was seized from Wheeler's warrantless search of Copelin's vehicle.[174]  The Magistrate found that Copelin was not entitled to habeas relief on this claim under *Stone v. Powell*, 428 U.S. 465 (1976).[175]  Under *Stone*, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Id.* at 490-94.  Copelin's objections merely rehash the arguments made before the

---

[174]    R. Doc. 11 at 30-31.
[175]    R. Doc. 26 at 52.

Magistrate Judge, and are without merit.[176]  In response to these objections, the State represents that it agrees with the Magistrate Judge's finding that petitioner is not entitled to federal habeas review of his Fourth Amendment claim.[177]

The Court finds that Copelin, who raised this issue in his motion for a new trial, and again on his motion post-conviction relief, had ample opportunity to fully and fairly litigate the claim in state court.[178]  Accordingly, he is precluded from raising this claim in his habeas petition.


### F.    Summary

In sum, the Court finds that Copelin has failed to establish that the state courts' denial of relief was contrary to, or involved an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d).

Rule 11 of the Rules Governing Section 2254 Proceedings provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rules Governing Section 2254 Proceedings, Rule 11(a) (noting that § 2253(c)(2) supplies the controlling standard).  The "controlling standard" for a certificate of appealability

---

[176]    R. Doc. 27 at 8.
[177]    R. Doc. 36 at 9.
[178]    State Rec., Vol. 5, *State v. Copelin* (La. App. 4 Cir.).

requires the petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented [are] 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  For the reasons stated in the Magistrate Judge's R&R, as well as this Order denying relief, the Court concludes that Copelin's petition fails to satisfy this standard.

## II.   CONCLUSION

For the foregoing reasons, Copelin's petition for a writ of habeas corpus is DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this   28th   day of December, 2021.

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE